972 So.2d 893 (2007)
DOOLEY AND MACK CONSTRUCTORS, INC., Appellant,
v.
DEVELOPERS SURETY AND INDEMNITY COMPANY and Buildtec Construction Group, Inc., Appellees.
No. 3D06-689.
District Court of Appeal of Florida, Third District.
November 7, 2007.
Rehearing and Rehearing Denied February 7, 2008.
*894 Gurley Dramis Lazo; Elizabeth Russo and Jonathan L. Gaines, Miami, for appellant.
Etcheverry Harrison LLP and Guy W. Harrison and Edward Etcheverry, Plantation, for appellee Developers Surety and Indemnity Co.
Before SHEPHERD, J., and SCHWARTZ and FLETCHER, Senior Judges.
Rehearing and Rehearing En Banc Denied February 7, 2008.
SCHWARTZ, Senior Judge.
The appellant Dooley and Mack Constructors, Inc., the general contractor on a Miami-Dade Community College project, was the obligee on a performance bond issued by Developers Surety and Indemnity Company, on behalf of Buildtec Construction Group, Inc., the masonry subcontractor. Dooley appeals from a final summary judgment for the surety in an action for damages it sustained when, after Buildtec defaulted by abandoning the job, Dooley undertook to and did complete the masonry work itself. We reverse.
The basis of the ruling below was the undisputed fact that the plaintiff had not formally notified the surety of its alleged right to cure its principal's default by itself completing the masonry work or otherwise arranging for the masonry work to be done. Under a familiar term of a "standard" surety bond, which is included in this one,[1] such a failure would indeed result in a termination of the surety's obligations. E.g., Ins. Co. of N. Am. v. Metro. Dade County, 705 So.2d 33 (Fla. 3d DCA 1997); Seaboard Sur. Co. v. Town of Greenfield, 370 F.3d 215 (1st Cir.2004); L & A Contracting Co. v. S. Concrete Servs., Inc., 17 F.3d 106 (5th Cir.1994) (applying Florida law); Sch. Bd. of Escambia County v. TIG Premier Ins. Co., 110 F.Supp.2d 1351 (N.D.Fla.2000). This rule does not apply here, however, simply because the particular agreement involved in this casewhich was drafted by Dooley (quite obviously for its own benefit) and accepted by the suretycontained an additional decisive provision which, to the contrary, specifically permits Dooley to proceed as it did. See OBS Co. v. Pace Constr. Corp., 558 So.2d 404 (Fla.1990); DCC Constructors, Inc. v. Randall Mech., Inc., 791 So.2d 575 (Fla. 5th DCA 2001); Henderson Inv. *895 Corp. v. Int'l Fid. Ins. Co., 575 So.2d 770 (Fla. 5th DCA 1991); Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co., 320 F.3d 1260 (11th Cir.2003) (applying Florida law), cert. denied, 540 U.S. 873, 124 S.Ct. 221, 157 L.Ed.2d 133 (2003). Article 5(d) of the subcontract, which was expressly made a part of the entire agreement, ("Subcontract is by reference made a part hereof, and is hereinafter referred to as the Subcontract.") states as follows:
If, in the opinion of Contractor, Subcontractor falls behind in the progress of the WORK, Contractor may require the Subcontractor to take such steps as Contractor deems necessary to improve the rate of progress including additional labor and labor time, plant time, or other remedies. Additionally, Contractor has the option, but not the obligation, to notify the Subcontractor that upon its failure to satisfactorily improve the rate of progress after forty-eight (48) hours notice, Contractor shall have the right to declare the Subcontract breached and take charge of and complete the performance of the WORK with such persons, firms, or corporations as Contractor shall deem necessary. In the event the cost to complete Subcontractor's contract exceeds the original contract price, Subcontractor shall be liable for all such extra costs and damages. The Subcontractor, its surety, and any bond shall be liable to all losses, damages, and expenses, including attorneys' fees and costs incurred in the prosecution or defense of any action, suit, or arbitration incurred by or resulting to the Contractor on the above account.
(Emphasis added). Reading all portions of the several documents together, as the law requires, see OBS Co., 558 So.2d at 406, it seems clear that they expressly grant Dooley the option either to call upon the surety, see Ins. Co. of N. Am., 705 So.2d at 33, or, as it did, to cure Buildtec's default itself and thereafter hold the "surety, and [the] bond . . . liable to all losses, damages, and expenses," (emphasis added), without notifying the surety as Article 5(d) simply does not require. Because none of the cases or authorities cited by the surety and relied on by the trial court involves the term which controls this case, a contrary result is required. See RLI Ins. Co. v. St. Patrick's Home for the Infirm & Aged, 452 F.Supp.2d 484 (S.D.N.Y.2006) (holding that absence of explicit notice requirement of principal's default to surety distinguishes cases finding that notice is condition precedent to surety's payment under bond); see generally Kilpatrick Bros. Painting v. Chippewa Hills Sch. Dist., No. 262396, 2006 WL 664210 (Mich.Ct.App. Mar.16, 2006).
Accordingly, we reverse the judgment below with directions to enter summary judgment on liability for the appellant and for further proceedings to determine its damages.
Reversed and remanded.
FLETCHER, Senior Judge, concurs.
SHEPHERD, J., dissenting.
I respectfully dissent. Neither the relationship of the parties in this case nor the contract documents governing that relationship are unusual, remarkable, or extraordinary.[2] The majority, however, seizes upon an obscure provision of the subcontract agreement, not signed by the surety, to afford Dooley and Mack a remedy *896 not contemplated either in the default provision of the subcontract or the bond. In so doing, I believe the majority misreads and misconstrues these documents.
The majority's interpretation of the agreements in this case effectively converts the bond into an insurance policy. The sentence upon which the majority relies to find "coverage" in Dooley and Mack, "[t]he Subcontractor, its surety, and any bond shall be liable to all losses, damages, and expenses, including attorneys' fees and costs incurred in the prosecution or defense of any action, suit, or arbitration incurred by or resulting to the Contractor on the above Account," actually appears in an article entitled "Progress of the Work" contained within the thirty-one page subcontract agreement signed by the contractor, Dooley and Mack, and the subcontractor, Buildtec Construction Group. The article, in its entirety, reads:
ARTICLE 5. PROGRESS OF WORK.
(a) Subcontractor shall give due consideration that other work is depending upon the work of this Agreement for proper completion. It is agreed that Contractor may require Subcontractor to prosecute some parts of the WORK over parts of the WORK.
(b) Subcontractor shall supply adequate supervision, skilled workmen, tools, materials and equipment to the project, and shall also promptly pay for all materials and labor furnished by him in the WORK. If required by Contractor, weekly certified payrolls shall be provided by the Subcontractor.
(c) Any, damages for delay caused by Subcontractor shall be deducted by Contractor from the agreed price for said work. It is agreed that the damages shall be the actual damages as provided by law.
(d) If, in the opinion of Contractor, Subcontractor falls behind in the progress of the WORK, Contractor may require the Subcontractor to take such steps as Contractor deems necessary to improve the rate of progress including additional labor and labor time, plant time, or other remedies. Additionally, Contractor has the option, but not the obligation, to notify the Subcontractor that upon its failure to satisfactorily improve the rate of, progress after forty-eight (48) hours notice, Contractor shall have the right to declare the Subcontract breached and take charge of and complete the performance of the WORK with such persons, firms, or corporations as Contractor shall deem necessary. In the event the cost to complete Subcontractor's contract exceeds the original contract price, Subcontractor shall be liable for all such extra costs and damages. The Subcontractor, its surety, and any bond shall be liable to all losses, damages, and expenses, including attorneys' fees and costs incurred in the prosecution or defense of any action, suit, or arbitration incurred by or resulting to the Contractor on the above account. Should any delay, on the part of the Subcontractor, in the completion of the WORK cause damage to the Owner for which the Contractor may be liable, Subcontractor shall be liable to the. Contractor therefore. Should the Contractor lose any bonus monies under its Prime Contract with the Owner as a result of the Subcontractor's delay, the Subcontractor shall be liable to the Contractor for the amount of said lost bonus as additional damages. Should the Contractor be obligated to pay to the Owner liquidated damages as a result of the Subcontractor's delay, the Subcontractor shall be liable for said damages, in addition to any other damages incurred by Contractor.
(e) Should Subcontractor be delayed in the progress of the WORK for reasons *897 which it believes is beyond its control, then the time within which the Subcontractor was to complete its contract may be extended by change order. The Subcontractor shall submit the written change order to the Contractor within forty eight (48) hours from the beginning of the delay. Should the Contractor refuse to approve such change order, then the matter shall be referred to the architect or engineer for a determination, which decision shall be final and binding upon the parties.
(f) Contractor shall not be liable to Subcontractor for delay to Subcontractor's WORK caused by circumstances beyond its control including the delivery of materials which have been ordered in a timely manner or on account of any circumstances caused or contributed to by the Subcontractor or others.
(g) Subcontractor shall not install its WORK on or over the work of others until he has first examined the work performed by others and determined that said work, together with the WORK under his contract, will produce an acceptable intended result in accordance with the Contract Documents and industry standards.
(h) Weekly Subcontractor coordination meetings may be required by the Contractor. If said meetings are scheduled, Subcontractor shall have his job foreman or other supervisory personnel who are able to commit to material deliveries and installation schedules attend said meeting. This requirement will be mandatory even if subcontractor is not currently working at the job site, up until the completion of this contract.
(i) The times that the job site is available for access by all Subcontractors shall be determined by the Contractor.
(emphasis added).
Article 5 does nothing more than delineate the responsibilities and obligations of the subcontractor concerning the execution of the work and establish the extent of potential liability of the subcontractor and the surety in the event the subcontractor fails to maintain the progress of the work. Indeed, as to the surety, the statement in Article 5(d) of the subcontract that the surety "shall be liable to all losses, damages, and expenses," not unlike the authorization in the same subsection for the contractor to order a quickened pace or ultimately take over the work, is in all probability legal surplusage. Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd., 593 So.2d 195, 198 (Fla.1992) ("[L]iability of a surety is coextensive with that of the principal. However, the surety's liability for damages is limited by the terms of the bond.") (citations omitted). There is nothing in Article 5 of the subcontract that supplants the notice provisions or any other provision of the performance bond.
In contrast, the performance bond affords a different and potentially greater benefit to the obligee, Dooley and Mack, than the remedies available to it under the subcontract, if Dooley and Mack elects to avail itself of the benefit upon a default. That benefit, as found in the Subcontract Performance Bond in this case, is the following:
Whenever Subcontractor shall be, and declared by Obligee to be in default under the Subcontract, . . . the Surety may promptly remedy the default, or shall promptly:
1) Complete the Subcontract in accordance with its terms and conditions.
2) Obtain a bid or bids for completing the Subcontract . . . and . . . arrange for a Subcontract between such bidder and Obligee, and make available as work progresses . . . sufficient funds to pay the cost of completion less the balance of the Subcontract price: but not exceeding, including other costs and damages *898 for which the Surety may be liable hereunder, the [Bond penal sum].
. . . .
In any event, the Principal's Subcontract time is of the essence, and the Surety agrees to indemnify and save harmless the Obligee of and from any and all loss, damage, and expense, including but not limited to delay damages (liquidated or actual), architectural, accounting, and engineering fees and costs (whether through Principal's default, suit, trial, appeal, alternative dispute resolution or otherwise), warranty claims, interest, costs and attorney's fees (whether through Principal's default, suit, trial, appeal, alternative dispute resolution or otherwise) that Obligee sustains from the Principal's default up to the penal sum of the Bond as set forth in the first paragraph hereof.
If the Surety does not proceed to remedy the Principal's default with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Obligee to the Surety demanding that the Surety perform its obligations under this Bond, and then Obligee shall be entitled to enforce any remedy available to the Obligee.
(emphasis added).
Pursuant to this bond provision, Dooley and Mack had a contractual right and option to call upon Developers Surety and Indemnity Company to make good on Buildtec's contract in the event of a default. If Developers was called upon and failed to meet its obligation, then Dooley and Mack was "entitled to enforce any remedy available to [it as] the Obligee [on the bond]." However, under the terms of the bond, it is clear Dooley and Mack was required to give Developers notice and an opportunity to cure any default or otherwise cause the contract to be completed before it could enforce "any remedy" against the surety. In fact, as the bond describes, Dooley and Mack was required to provide the surety with two notices of default in a very short time frame before it could sue Developers. Dooley and Mack admits it did not provide notices of default, but rather "focused on completing the job itself." There is no provision of the subcontract which negates the notice requirements of the bond. Under these circumstances, "Florida courts have long recognized that the liability of a surety should not be extended by implication beyond the terms of the contract i.e., the performance bond." Am. Home, 593 So.2d at 197 (citing State v. Wesley Constr. Co., 316 F.Supp. 490, 497 (S.D.Fla.1970), aff'd, 453 F.2d 1366, 1367 (5th Cir.1972)); Standard Accident Ins. Co. v. Bear, 134 Fla. 523, 534, 184 So. 97, 102 (1938); Gato v. Warrington, 37 Fla. 542, 548, 19 So. 883, 884 (1896); see also Crabtree v. Aetna Cas. & Sur. Co., 438 So.2d 102, 105 (Fla. 1st DCA 1983) ("A surety on a bond does not undertake to do more than that expressed in the bond, and has the right to stand upon the strict terms of the obligation as to his liability thereon."). Today's decision violates this settled interpretive principle in the law of suretyship.
Two additional points are worth making. First, to the extent that any article in the subcontract is material to a determination of the obligation of Developers on the bond, it is not "ARTICLE 5. PROGRESS OF THE WORK," seized upon by the majority, but rather "ARTICLE 16. DEFAULT." This article reads:
ARTICLE 16. DEFAULT
(a) Subcontractor shall be in default upon the occurrence of any of the following events or conditions:
(i) Be adjudged a bankrupt, or makes a general assignment for the benefit of his creditors, or a receiver is appointed *899 on account of its insolvency, or
(ii) Fails to abide by any term of this Agreement and its failure to rectify same after forty-eight (48) hours notice including failure or inability to diligently proceed with the WORK.
(b) Upon default by Subcontractor, Contractor shall have the right to declare this Agreement breached by Subcontractor and to correct, replace and/or re execute such faulty, defective or damaged work, or to take over the WORK required by this Agreement, . . . and complete the Agreement, . . . charging any additional costs incurred thereby to Subcontractor. Contractor shall also be deemed entitled to such other remedies as are available under the law of the state in which the project exist[s].
(c) Subcontractor shall be liable to Contractor for all losses, damages, and expenses, incurred in the settlement or defense of any action or suit as a result of Subcontractor's default or breach of contract, and Contractor may recover on the bond set forth in Article 12 hereof [requiring the posting of the bond in a separate instrument in accordance with local law], and Subcontractor and his surety agree to pay Contractor for such losses, damages, and expenses.
(emphasis added).
It is this article of the subcontract, not Article 5 as the majority suggests, that defines what constitutes a "default," see Subparagraph "(a)," thus triggering the potential obligation of the surety to respond under the bond. This article also recites the remedies available to the contractor. Subparagraph "(b)," continuing into the first clause of Subparagraph "(c)" describes the remedies the Contractor has against the subcontractor. Subparagraph "(c)" then continues to state that the Contractor "may recover on the bond set forth in Article 12[ ]" (emphasis added). There is no reference to Article V or any suggestion that the bond is in anyway conditioned by Article V. To me, this fact is telling.
Second, this analysis is consistent with the fact that in any dispute between the obligee and a surety, the bond is necessarily the primary determinant of surety liability. See Am. Home, 593 So.2d at 198 ("[Upon default], the terms of the performance bond control the liability of the surety."). The reasons for this are plain. First, the contract for the work, here the subcontract, usually precedes the issuance of the bond. Renegotiation of a contract or subcontract to assuage any or every concern of the surety at this stage is impractical. Second, as stated by the authors of one of the leading treatises on standard American Institute of Architects (AIA) construction documents in an analogous context:
Typically the parties executing B141 [the official AIA architectural services agreement] may not have read, reviewed, or discussed A 201 [General Conditions of Contract]. . . . Incorporation by reference of other, unseen documents that substantially change the parties' rights may be perceived as a dishonest or deceptive way to arrange for contractual terms that might not otherwise be acceptable to a party.
Justin Sweet & Jonathan Sweet, 1 Sweet on Constr. Indus. Contracts: Major AIA Documents 49 (4th ed. 1999).
Although there is no evidence of dishonesty or deceptiveness in this case, it is noteworthy that, at an earlier moment of conflict on the job, Dooley and Mack (which, as the majority properly points out, has trumpeted its contract and bond drafting expertise throughout its briefs in this case) declared Buildtec in default under the bond and copied Developers' purported *900 agent, but then reached an agreement to proceed with Buildtec before the instant controversy that brings us here today. Thus, it is quite apparent that Dooley and Mack knew it was required to give Developers the proper notices and opportunity to cure its principal's default before any rights accrued to it under the bond.
I would affirm the decision of the trial court.
NOTES
[1] NOW,

THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if Subcontractor shall promptly and faithfully perform said Subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.
Whenever Subcontractor shall be, and declared by Obligee to be in default under the Subcontract, the Obligee having performed its obligations thereunder, the Surety may promptly remedy the default or shall promptly:. . . .
(Emphasis added).
[2] For example, Dooley and Mack and the majority seek to make much of the provision in the bond which incorporates the subcontract into the bond. See supra p. 894-95. This is a standard performance bond clause. See, e.g., Clark Constr. Group, Inc. v. Wentworth Plastering of Boca Raton, Inc., 840 So.2d 357, 360 (Fla. 4th DCA 2003); DCC Constructors, Inc. v. Randall Mech., Inc., 791 So.2d 575, 576 (Fla. 5th DCA 2001).