[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-14861
_____

D.C. Docket No. 1:15-cv-24183-MGC


INTERNATIONAL FIDELITY INSURANCE
COMPANY,
a foreign corporation,
ALLEGHENY CASUALTY COMPANY,
a foreign corporation,

                                     Plaintiffs-Counter Defendants-Appellees,

                        versus

AMERICARIBE-MORIARTY JV,
a joint venture,

                                     Defendant-Counter Claimant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(February 28, 2017)

Before HULL, MARTIN and EBEL,[*] Circuit Judges.

MARTIN, Circuit Judge:

Americaribe-Moriarty JV ("Americaribe") appeals the District Court's order granting summary judgment for International Fidelity Insurance Company and Alleghany Casualty Company (together, "Fidelity") and denying its own motion for summary judgment.  Fidelity was the surety on a performance bond issued for a subcontract between Americaribe, a general contractor, and Certified Pool Mechanics 1, Inc. ("CPM").  After Americaribe terminated CPM for defaulting on the subcontract, it notified Fidelity, as required by the bond, but also hired a new subcontractor.  The parties dispute whether Americaribe's hiring of a new subcontractor breached the notice requirements in the termination provisions of the bond.  The District Court found Americaribe failed to properly comply with the bond's notice requirements, and held that Fidelity was therefore not liable for the bond.  After careful review, we affirm.  The bond incorporated the subcontract, and Americaribe did not comply with the notice requirements in the termination provisions of those documents.

## I.

Americaribe entered into a written subcontract with CPM for the pool work at the Brickell CityCentre Super Structure project in Miami, Florida.  The

---

[*]Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

subcontract included a termination provision that required Americaribe to provide

three-days notice before it could act to complete the job on its own:

> 12.2(a) <u>Termination for Cause</u>.  If Subcontractor at any time . . . fails
> to cure the default after the three (3) day notice in Article 11.2(a),
> Contractor shall be at liberty to terminate this Subcontract Agreement
> upon an additional three (3) day written notice mailed or delivered to
> Subcontractor and take possession of all materials on site and employ
> others to complete the Work. . . .   If the expense incurred by
> Contractor in finishing the Work plus damages suffered by the
> Contractor exceed the unpaid balance to be paid under this
> Subcontract Agreement then the Subcontractor shall pay the
> difference to the Contractor.

Fidelity, as the surety, issued a performance bond on behalf of CPM with

Americaribe as obligee.  Section 1 of the bond expressly incorporated the

subcontract.  The bond also included termination provisions.  Section 3 set out

three steps by which Americaribe could trigger Fidelity's obligations under the

bond, including a notice requirement in § 3.2:

> § 3 If there is no Owner Default under the Construction Contract, the
> Surety's obligation under this Bond shall arise after
>
> .1 the Owner first provides notice to the Contractor and the Surety that
> the Owner is considering declaring a Contractor Default.  Such notice
> shall indicate whether the Owner is requesting a conference among
> the Owner, Contractor and Surety to discuss the Contractor's
> performance. . . .
>
> .2 the Owner declares a Contractor Default, terminates the
> Construction Contract and notifies the Surety; and

3

.3 the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

Section 5 provided Fidelity with four options for completing CPM's work after it was terminated, allowing Fidelity to elect the option that best mitigated its damages:

§ 5 When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

§ 5.1 Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

§ 5.2 Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

§ 5.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract . . . ; or

§ 5.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1 After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or

.2 Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

If Fidelity failed to elect an option "with reasonable promptness," Americaribe had to provide Fidelity seven-days notice before it could enforce other remedies:

§ 6 If the Surety does not proceed as provided in Section 5 with reasonable promptness, the Surety shall be deemed to be in default on

4

this Bond seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner.

## II.

On August 17, 2015, Americaribe issued a notice of default to CPM and Fidelity, as called for by § 3 of the bond.  In the notice, Americaribe requested a conference call with Fidelity "to substitute CPM's scope . . . with an alternative subcontractor."  On August 20, Fidelity responded to Americaribe requesting more information and directing Americaribe "not to take any steps with respect to the completion of the project without the written consent of the Surety."  On September 2, the parties held a conference call.

On September 21, Americaribe sent CPM and Fidelity a letter terminating CPM, notifying Fidelity, and agreeing to pay the balance of the contract price, consistent with § 3 of the bond and § 12.2 of the subcontract.  However, on September 16, Americaribe got a proposal from Dillon Pools, Inc. for completing the work that remained on the subcontract.  And on September 17, Dillon sent Americaribe a schedule with a presumed start date of September 21.  Then on September 22, Americaribe sent vendors of CPM a letter, again copying Fidelity, and informing them of CPM's termination and that "[Americaribe] intends to award the subcontract to complete the remaining work . . . to Dillon."  As of

5

September 23, Dillon had begun "supplementation work and on site investigations to determine corrective work required for the project."

On October 1, Americaribe sent Fidelity the "additional written notice" required by § 6 of the bond, which started the seven-day clock toward Fidelity defaulting on its obligations under the bond. On October 8, Fidelity responded to Americaribe that its actions in engaging Dillon may have discharged Fidelity's obligations under the bond. On October 9, Americaribe responded that Fidelity was in default of the bond for not acting under § 5 with reasonable promptness. On November 5, Fidelity issued a formal denial of Americaribe's claim because Americaribe materially breached the bond "by commencing efforts to supplement CPM's work before providing the Surety with an opportunity to remedy any alleged default."

In the following months, Americaribe formalized its relationship with Dillon. On November 4, Dillon signed a subcontract with Americaribe. The contract is dated October 1, 2015, and lists a start date of September 28, 2015. On November 5, Americaribe paid Dillon $1,100,870.86 for invoices dated September 29 and 30 with a period ending date of September 30.[1] This payment included $450,000 for Bradford Products, LLC, which had supplied pool shells to CPM but had not been paid before CPM was terminated. About $71,416.26 of the payment

---

[1] Americaribe made an additional payment of $364,946.87 to Dillon for the same invoices on December 14.

was for various permits.[2]  The rest of the payment was for items like "Plumbing"

and "Mechanical Equipment/Installation."

Fidelity filed this action for declaratory judgment against Americaribe,

alleging it failed to satisfy the conditions precedent to make a claim against

Fidelity's bond and instead breached that bond.  Americaribe counterclaimed,

alleging it was Fidelity who breached the bond.  Americaribe and Fidelity each

moved for summary judgment.  The District Court granted Fidelity's motion and

denied Americaribe's motion.  Americaribe then filed this appeal.

## III.

"We review a district court's grant of summary judgment de novo, viewing

the evidence in the light most favorable to the nonmoving party."  Lage v. Ocwen

Loan Servicing LLC, 839 F.3d 1003, 1008–09 (11th Cir. 2016) (per curiam).

Summary judgment is proper when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552

(1986).  "[T]he mere existence of some alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510 (1986).  A fact is

---

[2] Americaribe's invoice lists $79,351.40 in charges for various permits.  All charges appear to be reduced by ten percent resulting in a true payment of $71,416.26.

7

"material" if it "might affect the outcome of the suit," and "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248, 106 S. Ct. at 2510.

The parties dispute whether Americaribe properly complied with the bond's notice provisions when it terminated CPM. As stated, the bond issued by Fidelity on behalf of CPM expressly incorporated the subcontract between CPM and Americaribe in § 1. Thus, we are presented with the threshold question of whether we look to the bond alone or the bond and the subcontract together to determine the notice requirements.

The parties agree that Florida law governs our determination of the responsibilities of Americaribe and Fidelity under their contract. Under Florida law, "[a] bond is a contract, and, therefore, a bond is subject to the general law of contracts." Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd., 593 So. 2d 195, 197 (Fla. 1992). "It is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." OBS Co. v. Pace Const. Corp., 558 So. 2d 404, 406 (Fla. 1990). In applying this rule, this Court has held "[w]here a provision for liquidated delay damages is clearly delineated in the underlying contract and incorporated by reference into the bond," the surety is liable for the delay damages even though the

8

terms of the bond do not expressly require it.  Nat'l Fire Ins. Co. of Hartford v. Fortune Const. Co., 320 F.3d 1260, 1275–76 (11th Cir. 2003) ("Florida courts have continued to utilize the well-established doctrine of incorporation by reference to impose liability on a performance bond surety."); see also DCC Constructors, Inc. v. Randall Mech., Inc., 791 So. 2d 575, 576–77 (Fla. 5th DCA 2001) (per curiam) (looking to the incorporated subcontract for the definition of "default").

In Dooley & Mack Constructors, Inc. v. Developers Sur. & Indem. Co., 972 So. 2d 893 (Fla. 3d DCA 2007), a Florida appellate court applied this principle of incorporation to the notice requirements in termination provisions of bonds and subcontracts.  Id. at 895.  As noted by the district court and the parties, an unpublished opinion from this Court said the Dooley decision demonstrated that, under Florida law, when a bond incorporates a subcontract we must look to both to determine the notice requirements with which a contractor must comply.  CC-Aventura, Inc. v. Weitz Co., 492 F. App'x 54, 55 (11th Cir. 2012) (per curiam) (unpublished).  Although we recognize that CC-Aventura is not binding precedent, it does provide guidance.

Here, both the bond and subcontract required Americaribe to provide notice to Fidelity when terminating CPM.  Americaribe did provide notice on September 21.  However, the subcontract required the contractor give three-days notice before undertaking to complete the work.  And the bond gave Fidelity time to choose

9

among four options for undertaking the work itself, after Americaribe sent the termination notice. This undefined period of time was then followed by another requirement for Americaribe to provide seven-days notice before Fidelity would be in default. Neither the bond nor the contract allowed Americaribe to immediately hire Dillon to complete the work.

The relevant language from the subcontract is in § 12.2(a), which required a "three (3) day written notice mailed or delivered to Subcontractor" after which Americaribe could "take possession of all materials on site and employ others to complete the Work." The relevant language in the bond is in § 5, which gave Fidelity a choice among four options to remedy CPM's default after Americaribe sent the termination notice, and § 6, which said:

> If the Surety does not proceed as provided in Section 5 with reasonable promptness, the Surety shall be deemed to be in default on this Bond seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond . . . .

Before Americaribe sent the termination notice on September 21, Dillon had already sent Americaribe a proposal for completing the work remaining on the subcontract, as well as a schedule with a presumed start date of September 21. Then, on September 22, Americaribe sent vendors of CPM a letter, copying Fidelity, informing them of CPM's termination and that "[Americaribe] intends to award the subcontract to complete the remaining work . . . to Dillon." As of

10

September 23, Dillon had commenced some work required for the project. Thus, the question is whether these actions breached the notice provisions of the bond and subcontract.

Americaribe argues its notice was sufficient, and that it did nothing to impede Fidelity from fulfilling its obligations under the bond. However, there is ample evidence that Americaribe paid Dillon to do work during the period immediately after Americaribe sent the termination notice to CPM. The bond allowed a time period for Fidelity to elect one of its options for completing CPM's work. On November 5, Americaribe paid Dillon $1,100,870.86 for invoices dated September 29 and 30 with a period ending date of September 30. Americaribe made another payment of $364,946.87 to Dillon for the same invoices on December 14. Americaribe argues these payments were actually for suppliers who supplied CPM, but who had not been paid by CPM before it was terminated. But the invoices show that only $450,000 of the payments were for Bradford Products, LLC, one of CPM's suppliers.[3] Americaribe also claims the rest of the invoices were mainly for products and permit fees, so they do not demonstrate significant work done by Dillon. Approximately $71,416.26 was paid for various permits. Even if we credit Americaribe's argument that the supplier and permit payments do not demonstrate that Dillon was performing work in September, that amount is

---

[3] Americaribe argues it also paid another supplier, Hornerxpress, but that payment appears to have been made separately, on October 15.

11

less than half of the payments it made.  The rest were for invoice items like "Plumbing" and "Mechanical Equipment/Installation."

Americaribe did not comply with the subcontract's three-day notice requirement.  It had already hired Dillon, which began remedying the defaulted work during that three-day period.  Neither did Americaribe comply with the bond's requirements, which expressly afforded Fidelity time to elect among options for completing the defaulted work.[4]  Americaribe's immediate hiring of Dillon to complete the project and the costs Dillon incurred completing CPM's work thwarted Fidelity's ability to choose among the options it had for remedying CPM's default under § 5 of the bond.  Therefore, Fidelity is not liable on the bond.  Americaribe's "failure to comply with the [] bond's notice provisions stripped the surety of its bargained for right and relieved the surety of its liability for the instant claim."  See Ins. Co. of N. Am. v. Metro. Dade Cty., 705 So. 2d 33, 35 (Fla. 3d DCA 1997).

**AFFIRMED.**

---

[4] It is not relevant that Americaribe and Dillon did not formally sign the contract until after the bond's election period.  It would defeat the purpose of the notice and election periods if contractors could just work around them by waiting to sign a contract.

12