# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 9, 2020    Decided April 7, 2020

No. 19-7033

WESTERN SURETY COMPANY,
APPELLEE

v.

U.S. ENGINEERING CONSTRUCTION, LLC,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00327)

---

*Stephen B. Sutton*, *pro hac vice*, argued the cause for appellant. With him on the briefs were *Adam S. Caldwell* and *Patrick J. Curran*, *Jr.*

*Thomas J. Moran* argued the cause and filed the brief for appellee.

Before: PILLARD and KATSAS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*:  Western Surety Company ("Western Surety") brought this action against U.S. Engineering Construction, LLC ("U.S. Engineering") in the district court seeking declaratory and injunctive relief regarding its potential liability under a construction performance bond.  Western Surety moved for summary judgment asserting that its obligations under the bond were discharged because U.S. Engineering failed to comply with a condition precedent, thereby relieving Western Surety of any liability.  The district court granted Western Surety's motion.  U.S. Engineering filed the instant appeal.  For the following reasons, we affirm the district court's grant of summary judgment.

I.

Turner Construction Company ("Turner"), not a party to this action, contracted with the Republic of South Africa to construct a new South African embassy in Washington, D.C.  On January 25, 2012, Turner and U.S. Engineering, the appellant in this case, entered into a subcontract in which U.S. Engineering would complete a range of work on the embassy.  On February 15, 2012, U.S. Engineering and United Sheet Metal, also not a party to this action, entered into a subcontract in which United Sheet Metal would complete work on the embassy related to the installation of sheet metal.

The contract price for the U.S. Engineering and United Sheet Metal subcontract was $585,000.  U.S. Engineering also paid $7,940 in premiums to obtain a construction performance bond from Western Surety, the appellee in this case, in which Western Surety and United Sheet Metal jointly and severally bound themselves to ensure the work under the U.S. Engineering and United Sheet Metal subcontract was

completed. This performance bond is the subject of the underlying dispute.

By agreement of the parties, the bond form used was the American Institute of Architects ("AIA") Document A312-2010 bond form, a standardized form commonly used in the construction industry. The bond refers to United Sheet Metal as the "Contractor," U.S. Engineering as the "Owner," and Western Surety as the "Surety." J.A. 144.

Section 3 of the bond outlines what must occur to trigger Western Surety's obligations in the event that United Sheet Metal is in default and the subcontract is terminated. Under section 3.1, U.S. Engineering must first provide notice to United Sheet Metal and Western Surety that it is considering declaring United Sheet Metal in default. If U.S. Engineering fails to provide such notice, section 4 excuses that failure except to the extent that Western Surety demonstrates actual prejudice. Under section 3.2, if U.S. Engineering officially decides to end its contractual relationship with United Sheet Metal, it must

> declare[] a Contractor Default, terminate[] the Construction Contract and notif[y] the Surety.

J.A. 145. Section 3.3 provides that U.S. Engineering must also agree to pay the balance of the contract price to Western Surety or to a contractor selected to perform the subcontract.

Under section 5,

> [w]hen the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

§ 5.1 Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

§ 5.2 Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

§ 5.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract . . . and pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor's Default; or

§ 5.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1 After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or

.2 Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

J.A. 145.

While working to complete the embassy, the parties began to encounter problems caused by United Sheet Metal. On February 6, 2013, Turner sent a formal notice to U.S. Engineering stating that any additional costs incurred from delays caused by U.S. Engineering and its subcontractors— namely, United Sheet Metal—would be back charged to U.S. Engineering. Turner highlighted that United Sheet Metal "lack[ed] materials, manpower, and completely ignore[d] direction given to them by U.S. Engineering Company or Turner." J.A. 201.

U.S. Engineering forwarded those concerns to United Sheet Metal in a "formal 'notice to correct'" letter, advising United Sheet Metal that it had "failed to comply with its obligations under the Subcontract" and that the company had "72 hours [to] demonstrate performance improvement." J.A. 202. Nevertheless, the problems persisted. Finally, on September 9, 2013, U.S. Engineering formally terminated its subcontract with United Sheet Metal.

The parties do not dispute that U.S. Engineering declared United Sheet Metal in default and terminated the subcontract. Nor do they dispute that U.S. Engineering failed to notify Western Surety that it was considering declaring United Sheet Metal in default and terminating the subcontract. In fact, the record is clear that U.S. Engineering did not notify Western Surety of the default and termination until June 9, 2014, when it sent a notice of claim against the bond, nearly nine months after the termination occurred. On June 13, 2014, Western Surety acknowledged receipt of the letter.

In the meantime, United Sheet Metal and U.S. Engineering began arbitration to settle various disputes related to the termination of the subcontract. On March 4, 2015, U.S.

Engineering attempted to join Western Surety in that dispute. In response, Western Surety brought this action in the district court. In Count I, Western Surety sought declaratory relief that it was "not required to arbitrate any disputes or controversies regarding its rights, liabilities, or obligations under the Bond." Complaint at 11, *W. Sur. Co. v. U.S. Eng'g Co.*, No. 15-cv-0327-TSC (D.D.C. Mar. 6, 2015). In Count II, it sought injunctive relief "prohibiting U.S. Engineering from participating in any arbitration proceedings which purport to determine or affect Western Surety's rights, liabilities, or obligations under the Bond." *Id.* Finally, in Count III, it sought declaratory relief that its obligations under the Bond had been discharged, "rendering the bond null and of no further force or effect." *Id.* On this third count, Western Surety specifically maintained that U.S. Engineering did not have a right to make a claim under the bond because of its "extreme delay in providing notice to Western Surety of United Sheet Metal's alleged default and termination." *Id.* at 10.

Western Surety moved for summary judgment on the first two counts. The district court granted the motion, leaving only the question of whether Western Surety's obligations under the bond had been discharged by U.S. Engineering's failure timely to comply with the notice provision of section 3.2. U.S. Engineering then filed its answer, asserting that section 3.2 required it only to provide notice of the default and termination without any specific time limitation. U.S. Engineering thus argued that Western Surety was obligated to perform under section 5 of the bond.

On March 2, 2017, Western Surety filed a new motion for summary judgment on its remaining claim and U.S. Engineering's counterclaims. The district court granted Western Surety's motion on all claims. The court held that, "although Section 3.2 [of the bond] does not explicitly state

that U.S. Engineering must notify Western Surety within a certain amount of time, the explicit grant to Western Surety of a right to remedy the default necessarily implies that *timely* notice is required to trigger Western Surety's obligation under the Bond because Section 5 operates only if timely notice is given." *W. Sur. Co. v. U.S. Eng'g Co.*, 375 F. Supp. 3d 1, 6 (D.D.C. 2019) (emphasis added). Specifically, the district court relied on this court's decision in *Hunt Construction Group v. National Wrecking Corporation*, 587 F.3d 1119 (D.C. Cir. 2009), in which we held that a party's failure to provide notice to the surety of default and termination before completing the work through other subcontractors was a failure of a condition precedent and discharged the surety's obligations under a similar AIA bond. *See id.* at 1121–22. As the district court noted in this case, "[we] reasoned that sureties' options to remedy the default would be 'nonsensical' without the inference that the sureties should be given timely notice of the declaration of default." *W. Sur. Co.*, 375 F. Supp. 3d at 6 (quoting *Hunt Constr. Grp.*, 587 F.3d at 1121).

The district court also held that Western Surety only had to prove actual prejudice in the event of U.S. Engineering's failure to provide notice to Western Surety that it was considering declaring United Sheet Metal in default under section 3.1, not in the event of U.S. Engineering's failure to provide notice that it had actually declared United Sheet Metal in default and terminated the subcontract under section 3.2. U.S. Engineering filed the instant appeal challenging both holdings.

II.

We review the district court's grant of summary judgment *de novo*. *Mayo v. Reynolds*, 875 F.3d 11, 19 (D.C. Cir. 2017). Summary judgment is appropriate if, viewing the facts in the

light most favorable to the nonmoving party, there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56. The parties agree that D.C. law applies.

A.

U.S. Engineering primarily argues that the plain language of the bond simply requires notice of default and termination, not notice sufficiently early to enable every potential option to cure, to trigger Western Surety's obligations under the bond. In the alternative, it argues that if the bond's language is ambiguous as to whether timely notice is required, the court should construe any ambiguous language with due regard for the bond's purpose to protect U.S. Engineering from United Sheet Metal's default and to avoid a forfeiture.

Like the district court, we conclude that *Hunt* is controlling. *Hunt* involved AIA Document A311, which expressly provides that, if the contractor is declared to be in default, the surety has an opportunity to "promptly remedy" that default. *Hunt Constr. Grp.*, 587 F.3d at 1120. It also allows the owner to remedy the default on its own terms "after reasonable notice" to the surety. *Id.* The owner in that case declared the contractor in default and terminated the construction contract but did not notify the surety of the default and termination until five months later. *Id.* In the meantime, the owner employed another contractor to finish the remaining work without consulting the surety. *Id.* Construing the A311 bond, we determined that timely notice was a condition precedent to the surety's obligations under the bond. *Id.* at 1120–22. As the district court noted in this case, we explained that accepting Hunt's contrary argument "would gut rights specifically afforded the surety"—namely, the bond's "explicit grant to the surety of a right to remedy the default itself." *Id.* at 1121–22.

The A312 bond at issue in this case states that, in order to trigger Western Surety's obligations under the bond, U.S. Engineering must declare a United Sheet Metal default, terminate the subcontract, and notify Western Surety. Similar to the A311 bond, the A312 bond provides four alternative methods by which the surety can respond to the default. By unilaterally completing United Sheet Metal's remaining contract obligations before notifying Western Surety, U.S. Engineering deprived Western Surety of its contractually agreed-upon opportunity to participate in remedying United Sheet Metal's default.

To be sure, under several provisions of the bond, Western Surety could not have responded to the default without U.S. Engineering's consent. But even so, that limitation did not give U.S. Engineering the right to address the situation without consulting Western Surety and then recover under the bond nine months later. In other words, despite the bond's lack of an explicit *timely* notice requirement, the performance bond is properly read as requiring U.S. Engineering to notify Western Surety of the default before engaging in self-help remedies. Otherwise, "the explicit grant to the surety of a right to remedy the default itself would be operative only if the obligee chose to give it notice," thereby rendering the options in section 5 "nearly meaningless." *Id.* at 1121. Accordingly, because the bond expressly provides the surety with the opportunity to participate in curing the subcontractor's default, we hold that it is a condition precedent to the surety's obligations under the bond that the owner must provide timely notice to the surety of any default and termination before it elects to remedy that default on its own terms. In light of U.S. Engineering's failure to provide such timely notice, Western Surety was not obligated to perform under the bond.

We note separately that at least one other court construing the A312 bond reached a similar conclusion. Although not dealing with a failure of notice under section 3.2, the Eleventh Circuit determined that if an obligee hires a new subcontractor before the surety has an opportunity to respond to the termination, the surety's obligations under the bond are discharged. *Int'l Fid. Ins. Co. v. Americaribe-Moriarty JV*, 681 F. App'x 771, 776–77 (11th Cir. 2017). The Eleventh Circuit emphasized that such an action "thwart[s] [the surety's] ability to choose among the options it had for remedying [the subcontractor's] default under § 5 of the bond." *Id.*

Because we do not conclude that the bond is ambiguous, we need not address U.S. Engineering's arguments that surety bonds should be construed liberally in favor of the beneficiary and to avoid a forfeiture. *See, e.g.*, *St. Paul Fire & Marine Ins. Co. v. VDE Corp.*, 603 F.3d 119, 123 (1st Cir. 2010) ("Although '[t]he prevailing doctrine is that [a surety bond] should be liberally interpreted in favor of its beneficiary,' that principle 'is not a blank check to the judicial power to rule out the pacts and agreements between the parties.'" (alterations in original) (quoting *Citibank v. Grupo Cupey, Inc.*, 382 F.3d 29, 31–32 (1st Cir. 2004))); *Wash. Props., Inc. v. Chin, Inc.*, 760 A.2d 546, 549 (D.C. 2000) ("As a general rule of contract interpretation, there is a presumption in favor of construing *doubtful* language in a contract as language of promise rather than as language of condition." (emphasis added)).

## B.

U.S. Engineering also contends that section 4 of the bond requires Western Surety to demonstrate actual prejudice in order to avoid liability under the bond if there is a failure to provide notice under any section. It argues that section 4 expressly referenced a failure to give notice only under section

3.1 because that was the only notice requirement the parties intended to include in the bond. To the extent the court implies a timely notice requirement under section 3.2, U.S. Engineering asserts that the requirement to demonstrate actual prejudice to avoid liability under the bond should equally apply to any such implied condition.

Section 4 states, "Failure on the part of the Owner to comply with the notice requirement *in Section 3.1* shall not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice." J.A. 145 (emphasis added). By its plain language, the requirement to demonstrate actual prejudice clearly applies to a failure to give notice only under section 3.1. There is no similar requirement when U.S. Engineering fails to give timely notice of the default and termination under section 3.2. U.S. Engineering's assertion that the parties intended section 3.1 to be the only notice requirement in the bond makes little, if any, sense. By its express terms, section 3.2 clearly provides that U.S. Engineering must "notify" Western Surety of the default and termination in order to trigger Western Surety's obligation to act under section 5. J.A. 145. Accordingly, we conclude that the plain language of the bond is unambiguous that the surety is not required to demonstrate actual prejudice to avoid liability under the bond if the obligee fails to provide notice of default and termination under section 3.2.

Even assuming we agreed with U.S. Engineering that Western Surety must demonstrate actual prejudice to avoid liability in this situation, it would not change the outcome. By failing to provide notice under section 3.2, U.S. Engineering robbed Western Surety of its contractually agreed-upon opportunity to participate in the mitigation process entirely. Although not necessary to our opinion, it would seem that is

inherently prejudicial. Thus, even if we required Western Surety to demonstrate actual prejudice, it would not be liable under the bond due to the inherent prejudice it suffered.

Again, another court interpreting the A312 bond agrees with our interpretation. The Nevada district court determined that "failure to comply with section 3.2 is a condition precedent to [the surety's] obligations arising under the bond, and the parties contractually agreed that [the surety] need not show prejudice from that failure to relive it of its obligations." *United States ex rel. Agate Steel, Inc. v. Jaynes Corp.*, No. 2:13-CV-01907-APG-NJK, 2016 WL 8732302, at \*7 (D. Nev. June 17, 2016).

## III.

Because U.S. Engineering failed to comply with the condition precedent to provide timely notice of default and termination under section 3.2, Western Surety was not obligated to perform under the bond. Additionally, the bond is clear that Western Surety is not required to demonstrate actual prejudice to avoid liability under these circumstances. We thus affirm the district court's grant of summary judgment.