[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10814

_____

D.C. Docket No. 1:15-cv-24183-MGC

INTERNATIONAL FIDELITY INSURANCE COMPANY,
a foreign corporation,
ALLEGHENY CASUALTY COMPANY,
a foreign corporation,

Plaintiffs-Appellees,

versus

AMERICARIBE-MORIARTY JV,
a joint venture,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 26, 2018)

Before ROSENBAUM, HULL and JULIE CARNES, Circuit Judges.

HULL, Circuit Judge:

Americaribe-Moriarty JV ("Americaribe"), a general contractor, appeals the district court's award of $154,536 in attorney's fees to International Fidelity Insurance Company and Allegheny Casualty Company (together, "Fidelity"), the surety on a performance bond issued for a construction subcontract between Americaribe and the subcontractor Certified Pool Mechanics 1, Inc. ("CPM"). In this lawsuit, Fidelity sought a declaratory judgment that Americaribe was not entitled to assert a claim against Fidelity's performance bond. Int'l Fidelity Ins. Co. v. Americaribe-Moriarty JV, 681 F. App'x 771, 775-77 (11th Cir. 2017) (unpublished). In the first appeal, we affirmed the district court's grant of summary judgment to Fidelity, holding Fidelity had no liability under its performance bond. Id. Subsequently, the district court awarded attorney's fees to Fidelity against Americaribe.

In this second appeal, Americaribe argues that Fidelity is not entitled to recover the attorney's fees it incurred in this litigation because neither the performance bond nor the subcontract provides for such an award of prevailing party attorney's fees. After careful review of the record, and with the benefit of oral argument, we agree and reverse the award of attorney's fees.

## I. FACTUAL BACKGROUND

### A.    The Construction Subcontract

Americaribe, as general contractor, and CPM, as subcontractor, entered into a written subcontract agreement for CPM to perform certain pool work at the construction project commonly known as the Brickell CityCentre Super Structure in Miami, Florida.  Id.  The subcontract included a termination provision, which provided that, if CPM defaulted on its work, Americaribe was required to give CPM three-days' notice before it could act to complete CPM's work:

> 12.2(a) Termination for Cause. If [CPM] at any time . . . fails to cure the default after the three (3) day notice in Article 11.2(a), [Americaribe] shall be at liberty to terminate this Subcontract Agreement upon an additional three (3) day written notice mailed or delivered to [CPM] and take possession of all materials on site and employ others to complete the Work. . . .  If the expense incurred by [Americaribe] in finishing the Work plus damages suffered by [Americaribe] exceed the unpaid balance to be paid under this Subcontract Agreement then [CPM] shall pay the difference to [Americaribe].

Notably, the subcontract did not include a separate general attorney's fees provision allowing for the award of attorney's fees to Americaribe or CPM when either party was required to take action to enforce the subcontract.  However, the subcontract did contain the following general indemnity provision in Section 9.5:

> Indemnification.  To the fullest extent permitted by law, [CPM] shall indemnify and hold harmless [Americaribe], its officers, directors or employees and the Owner, from and against all claims, damage, los[s]es and expenses (including, but not limited to attorneys fees) arising out of, in connection with or resulting from the performance of

3

Work under this Subcontract Agreement, including if caused in whole or in part by any act, omission, default or contract performance or non-performance by [Americaribe] or its officers, directors, agents or employees when any such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting there from. Such indemnification shall not include claims of, or damages resulting from, gross negligence, or willful, wanton or intentional misconduct of [Americaribe] or its officers, directors, agents or employees. The parties mutually acknowledge that the amount of indemnity provided hereunder bears a reasonable commercial relationship to this Subcontract Agreement and is equal to the limits of aggregate insurance provided by [CPM] under this Subcontract Agreement or $1 million, whichever is greater, and that the requirements of §725.06, Fla. Stat. have been fulfilled and apply to this Article 9.5.

## B.    The Performance Bond

Fidelity, as the surety, issued a performance bond on behalf of subcontractor CPM, with Americaribe as the obligee. Id. at 772. Section 1 of the bond expressly incorporated the subcontract. Section 3 set forth three steps that Americaribe was required to take to trigger Fidelity's obligation under the bond:

§ 3 If there is no Owner Default under the Construction Contract, [Fidelity's] obligation under this Bond shall arise after

.1 [Americaribe] first provides notice to [CPM] and [Fidelity] that [Americaribe] is considering declaring a Contractor Default. Such notice shall indicate whether [Americaribe] is requesting a conference among [Americaribe], [CPM] and [Fidelity] to discuss [CPM's] performance . . . ;

.2 [Americaribe] declares a Contractor Default, terminates the Construction Contract and notifies [Fidelity]; and

4

.3 [Americaribe] has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to [Fidelity] or to a contractor selected to perform the Construction Contract.

Section 5 then provided Fidelity with four options for completing CPM's work if the subcontract was terminated:

§ 5 When [Americaribe] has satisfied the conditions of Section 3, [Fidelity] shall promptly and at [Fidelity's] expense take one of the following actions:

§ 5.1 Arrange for [CPM], with the consent of [Americaribe], to perform and complete the Construction Contract;

§ 5.2 Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

§ 5.3 Obtain bids or negotiated proposals from qualified contractors acceptable to [Americaribe] for a contract for performance and completion of the Construction Contract . . . ; or

§ 5.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1 After investigation, determine the amount for which it may be liable to [Americaribe] and, as soon as practicable after the amount is determined, make payment to [Americaribe]; or

.2 Deny liability in whole or in part and notify [Americaribe], citing the reasons for denial.

According to Section 6, if Fidelity failed to elect an option "with reasonable promptness," Americaribe had to provide Fidelity seven-days' notice before it could enforce other remedies.

5

## C.    Alleged Default By CPM

CPM allegedly defaulted on the subcontract with regard to its pool installations.  Id. at 773.  On August 17, 2015, Americaribe sent a notice of default to CPM and Fidelity, in which it requested a conference call with Fidelity to "substitute CPM's scope" with another subcontractor.  Id.  On August 20, Fidelity replied, asking for more information and directing that Americaribe not take any steps to complete the project without Fidelity's written consent.  Id.  On September 2, Fidelity, CPM, and Americaribe held a conference call to discuss CPM's performance under the subcontract.  Id.

Two weeks later, on September 16, Americaribe obtained a proposal from a new subcontractor, Dillon Pools, Inc. ("Dillon"), for completing the pool construction work that remained on the subcontract.  Id. at 774.  The next day, Dillon sent Americaribe a work schedule with a presumed start date of September 21.  Id.

Also on September 21, Americaribe sent CPM and Fidelity a letter officially declaring CPM in default, terminating the subcontract, and making a demand upon Fidelity to perform under the performance bond, pursuant to Sections 3.2 and 3.3 of the bond, as well as Section 12.2(a) of the subcontract.  Id. at 773-74.  The next day, on September 22, Americaribe sent Fidelity a letter stating that it intended to award the subcontract to complete the remaining work to Dillon.  Id. at 774.  As of

6

September 23, Dillon started performing supplementation work and investigating the site to determine what work was necessary to complete the pool construction project.  Id.

Shortly thereafter, on October 1, Americaribe sent Fidelity a notice demanding that it perform its obligations under the bond within seven days.  Id.  In response, on October 8, Fidelity told Americaribe that its action in engaging Dillon may have discharged Fidelity's obligation under the bond.  Id.  Americaribe disagreed, responding that Fidelity was in default of the bond for not acting under Section 5 with reasonable promptness.  Id.  Fidelity issued a formal denial of Americaribe's claim on November 5, asserting that Americaribe had breached the bond "by commencing efforts to supplement CPM's work before providing [Fidelity] with an opportunity to remedy the alleged default."  Id. (quotations omitted).

## D.    The Underlying Litigation

Fidelity then filed this declaratory judgment action against Americaribe, alleging that Americaribe failed to satisfy the conditions precedent to assert a claim against the bond and materially breached the bond.  Id.  As part of its requested relief, Fidelity asked the district court to declare that it had no obligations to Americaribe under the bond and that the bond was null and void.  Fidelity also asked the court for attorney's fees, pursuant to the performance bond, the

7

subcontract, and Florida statutes. Americaribe counter-claimed, arguing that CPM materially breached the subcontract and Fidelity breached the performance bond by refusing to remedy CPM's default or to arrange for the performance of CPM's obligations under the subcontract. Id. Americaribe also made a demand for attorney's fees pursuant to applicable Florida statutes.

As to the merits of the claims, the parties disputed whether Americaribe's hiring of Dillon breached the notice requirements in the termination provisions of the bond and subcontract. Id. at 772. Both parties moved for summary judgment. Ultimately, the district court concluded that Americaribe had materially breached the performance bond by: (1) failing to provide reasonable notice to Fidelity before undertaking to remedy CPM's default; and (2) unilaterally retaining Dillon to complete the subcontract, which prevented Fidelity from exercising its performance options under the bond. The district court, therefore, granted summary judgment to Fidelity, finding that Americaribe was not entitled to any relief under the bond. The district court entered final judgment in favor of Fidelity, declaring that "[Americaribe's] breach of the subject performance bond . . . rendered the performance bond null and void and of no further force and effect." Americaribe appealed.

8

### E.    Americaribe's First Appeal

In that first appeal, this Court affirmed the district court's conclusion that Americaribe was not entitled to any relief under the performance bond. Id. We concluded that, to decide whether Americaribe properly complied with the bond's notice requirements in terminating CPM, we were required to look at the terms of both the performance bond and the subcontract because Section 1 of the bond expressly incorporated the subcontract. Id. at 775.

Next, while recognizing that Americaribe had notified Fidelity that it was terminating CPM on September 21, we held that the notice was insufficient under both the subcontract and the performance bond. Id. at 775-77. We explained that Americaribe did not comply with the subcontract's three-day notice requirement because it "had already hired Dillon, which began remedying the defaulted work during that three-day period." Id. at 776. Moreover, "Americaribe's immediate hiring of Dillon to complete the project and the costs Dillon incurred completing CPM's work thwarted Fidelity's ability to choose among the options it had for remedying CPM's default under § 5 of the bond." Id. at 776-77. For these reasons, this Court held that Fidelity was not liable on the bond. Id. at 777.

### F.    The Attorney's Fees Order

While the appeal was pending, Fidelity moved the district court for an award of attorney's fees, pursuant to the general indemnification provision in Section 9.5

9

of the subcontract and the reciprocal effect of Fla. Stat. § 57.105(7).  Specifically,

Fidelity advanced a multi-step argument as to why it was entitled to attorney's fees

under the subcontract: (1) the Section 9.5 indemnity clause provided that

Americaribe was entitled to recover attorney's fees from CPM in matters arising

out of, in connection with, or resulting from the performance of work under the

subcontract; (2) Fla. Stat. § 57.105(7) provides that such one-sided contractual

attorney's fees provisions apply to both parties to the contract and thus CPM is

also entitled to recover attorney's fees under that Section 9.5 indemnification

clause; and (3) if CPM is entitled to such reciprocal attorney's fees, then Fidelity is

entitled to attorney's fees as well because, as the surety, it "stepped into the shoes"

of CPM.[1]

Americaribe disputed Fidelity's legal entitlement to fees.  Later on, a

magistrate judge issued a report and recommendation ("R&R"), recommending, in

relevant part, that the district court award Fidelity $154,536 in attorney's fees

based on the Section 9.5 indemnity clause in the subcontract, the reciprocal nature

of Fla. Stat. § 57.105(7), and principles of surety law.  Over Americaribe's

---

[1]Fidelity also argued that it was entitled to attorney's fees pursuant to Section 7 of the bond, which stated that Fidelity would be liable for legal costs resulting from CPM's default of the subcontract.  Fidelity has withdrawn this argument on appeal, and therefore we will not discuss it further.

objections, the district court adopted the R&R and entered a final judgment awarding Fidelity $154,536 in attorney's fees.

This is Americaribe's appeal of the attorney's fees judgment.

## II. STANDARD OF REVIEW

We review de novo the district court's interpretation of contractual provisions, including its interpretation of an indemnity clause. See Dionne v. Floormasters Enters., 667 F.3d 1199, 1203 (11th Cir. 2012); Natco Ltd. P'ship v. Moran Towing of Fla., Inc., 267 F.3d 1190, 1193 (11th Cir. 2001). We also review de novo the district court's interpretation of Florida law. Davis v. Nat'l Med. Enterps., 253 F.3d 1314, 1319 (11th Cir. 2001). We review the district court's ultimate decision to grant or deny attorney's fees for an abuse of discretion. Id. at 1318-19.

## III. DISCUSSION

### A.    Florida Law Regarding Attorney's Fees

Under Florida law, absent a specific statutory or contractual provision, a prevailing litigant has no general entitlement to attorney's fees. Dade Cty. v. Pena, 664 So. 2d 959, 960 (Fla. 1995); Gen. Motors Corp. v. Sanchez, 16 So. 3d 883, 884 (Fla. Dist. Ct. App. 2009) (explaining that it is "well established in Florida, which fully endorses the so-called American Rule on the question, that each party, including the successful one, in litigation must ordinarily bear the burden of his

11

own attorneys' fees"). As such, a "contractual attorney's fee provision must be strictly construed." B & H Constr. & Supply Co. v. Dist. Bd. of Trustees of Tallahassee Cmty. Coll., 542 So. 2d 382, 387 (Fla. Dist. Ct. App. 1989).

Florida courts have explained that "if an agreement for one party to pay another party's attorney's fees is to be enforced it must unambiguously state that intention and clearly identify the matter in which the attorney's fees are recoverable." Sholkoff v. Boca Raton Cmty. Hosp., Inc., 693 So. 2d 1114, 1118 (Fla. Dist. Ct. App. 1997). If the agreement is ambiguous, "the court will not struggle by construction of the language employed to infer an intent for fees that has not been clearly expressed; nor will it allow intentions to indemnify another's attorney's fees to be ambiguously stated and then resolved by the finder of fact." Id.

In addition, § 57.105(7) of the Florida Statutes renders a unilateral contract clause for prevailing party attorney's fees bilateral in effect. Merchants Bonding Co. (Mut.) v. City of Melbourne, 832 So. 2d 184, 185 (Fla. Dist. Ct. App. 2002). Specifically, Fla. Stat. § 57.105(7) provides:

> If a contract contains a provision allowing attorney's fees to a party when he or she is required to take any action to enforce the contract, the court may also allow reasonable attorney's fees to the other party when that party prevails in any action, whether as plaintiff or defendant, with respect to the contract.

12

Fla. Stat. § 57.105(7).  The statute, however, is not an independent source for the award of legal fees.  See Fla. Hurricane Prot. & Awning, Inc. v. Pastina, 43 So. 3d 893, 895 (Fla. Dist. Ct. App. 2010) (explaining that the "statute is designed to even the playing field, not expand it beyond the terms of the agreement").  Rather, § 57.105(7) only applies in instances where there is a contract provision allowing attorney's fees to one party when it is required to take legal action to enforce the contract.  Fla. Stat. § 57.105(7).

### B.    Florida Law Regarding Indemnification Clauses

That means the threshold question in this appeal is whether the indemnity provision in Section 9.5 of the subcontract is a unilateral attorney's fees provision that would allow Americaribe to recover attorney's fees if it was required to take legal action against CPM to enforce the subcontract.  If so, then under Fla. Stat. § 57.105(7), CPM would also be entitled to recover attorney's fees, and, in turn, perhaps even Fidelity as well.

Under Florida law, contractual language, when possible, is to be interpreted according to its plain meaning and in accordance with generally accepted rules of construction to give effect to the intent of the parties.  See Intervest Constr. of Jax, Inc. v. Gen. Fid. Ins. Co., 133 So. 3d 494, 497 (Fla. 2014).  Likewise, indemnity contracts are subject to the general rules of contractual construction, such that an

13

indemnity contract must be construed based on the intentions of the parties.  See Dade Cty. Sch. Bd. v. Radio Station WQBA, 731 So. 2d 638, 643 (Fla. 1999).

Generally speaking, "[a] contract for indemnity is an agreement by which the promisor agrees to protect the promisee against loss or damages by reason of liability to a third party."  Id. (emphasis added); see also Sanislo v. Give Kids the World, Inc., 157 So. 3d 256, 265 (Fla. 2015) (explaining that indemnity agreements "are typically negotiated at arm's length between sophisticated business entities and can be viewed as an effort to allocate the risk of liability").  That is, it is generally not the case that an indemnity clause will be understood to include protections for the expense of liability caused by the indemnified party itself.  See MVW Mgmt., LLC v. Regalia Beach Developers LLC, 230 So. 3d 108, 112 (Fla. Dist. Ct. App. 2017) ("An indemnification provision that is silent or unclear whether it applies to first-party claims will normally be interpreted to apply only to third-party claims.").  Likewise, "'a party to a contract cannot use an indemnity clause to shift attorney fees between the parties unless the language of the clause shows an intent to clearly and unambiguously shift the fees.'"  Id. at 113 (quoting persuasive authority with approval).

Florida courts have held that indemnification clauses similar to the one in this case apply only to liability for claims brought by third parties, and not to suits between the contracting parties.  In Century Village, Inc. v. Chatham

14

Condominium Ass'ns, an indemnification clause in a lease agreement held a lessor harmless from liability against "any and all claims" made against the lessor arising out of the lease contract and awarding any sums owed and attorney's fees to the lessor should it have to defend any action. 387 So. 2d 523, 523 (Fla. Dist. Ct. App. 1980). The Florida appellate court held that the lessor, who was sued by the lessee, was not entitled to attorney's fees under this indemnification clause. Id. at 523-54. The Florida court explained that it was "quite obvious" that the indemnification clause was not intended to apply to actions between the contracting parties to the lease, but rather to claims of third parties against the lessor. Id. at 524. Notably, the Florida court explained:

> Accepting the lessor's contention would amount to accepting the incongruous theory that although the appellees may be successful in their litigation, they would nevertheless have to satisfy their own judgment in addition to paying the lessor's costs. The law will not sanction such an anomaly.

Id.

The Florida Supreme Court adopted the rule from Century Village in reversing an award of prevailing party attorney's fees. Penthouse N. Ass'n v. Lombardi, 461 So. 2d 1350, 1352-53 (Fla. 1984). In Penthouse North, a condominium association sued its directors and the trial court dismissed the suit. Id. at 1351. The Florida Supreme Court rejected the directors' request for attorney's fees based on an indemnification provision in a contract between the

15

association and directors, concluding instead that the indemnification provision applied only to actions between the directors and third parties, and not to actions between the contracting parties.  Id. at 1352-53; see also Traylor Bros. v. Melvin, 776 So. 2d 947, 948 (Fla. Dist. Ct. App. 2000) (denying attorney's fees to a prevailing party because the "indemnification clauses in the Lease Agreement d[id] not provide for an award of attorney's fees to the prevailing party in litigation between the contracting parties").

With these principles in mind, we conclude that Fidelity is not entitled to attorney's fees under the subcontract's indemnity provision.  Section 9.5 of the subcontract contains a broad indemnification provision, which reads in relevant part:

> Indemnification.  To the fullest extent permitted by law, [CPM] shall indemnify and hold harmless [Americaribe], its officers, directors or employees and the Owner, from and against all claims, damage, los[s]es and expenses (including, but not limited to attorneys fees) arising out of, in connection with or resulting from the performance of Work under this Subcontract Agreement . . . .

This is a general indemnity provision that by default under Florida law applies only to liability for third party claims.  See Dade, 731 So. 2d at 643.  This provision does not on its face unambiguously state or clearly identify that Americaribe would be entitled to attorney's fees when either Americaribe or CPM was required to take action to enforce the subcontract.  See Sholkoff, 693 So. 2d at 1118; MVW Mgmt., 230 So. 3d at 112-13.  Had Americaribe and CPM intended to

16

depart from the default position that indemnity provisions apply only to third party liability, they could have done so expressly in the subcontract. Likewise, had they wished to depart from the general rule in Florida that prevailing litigants are not entitled to attorney's fees, they could have included a prevailing party attorney's fee provision in the subcontract as well. Because they did neither, we will not infer an intent for attorney's fees that has not been clearly and unambiguously expressed and certainly not from the standard indemnification clause in Section 9.5 of the subcontract. To rule otherwise would be tantamount to re-writing the contract between the parties. See Marriott Corp. v. Dasta Constr. Co., 26 F.3d 1057, 1068 (11th Cir. 1994) ("It is not the function of the courts to rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto . . . ." (quotation omitted)). Because the general indemnity provision of the subcontract would not allow Americaribe to recover attorney's fees in an action against CPM to enforce the subcontract, that provision is not a unilateral contract provision for attorney's fees and thus does not come within the scope of Fla. Stat. § 57.105(7).

Fidelity has not cited any case law, nor have we found any, that would support the notion that a general indemnity clause like the one here should be considered a one-sided prevailing party attorney's fee provision in litigation involving the parties' liability under the contract. Instead, Fidelity relies on two

17

cases—Ajax Paving Indus. v. Hardaway Co., 824 So. 2d 1026 (Fla. Dist. Ct. App. 2002), and ADF Int'l, Inc. v. Baker Mellon Stuart Constr., Inc., 2001 WL 34402607 (M.D. Fla. Apr. 6, 2001)—but neither stands for that proposition.

First, Fidelity suggests that, in Ajax, the Florida court found that "[a] broad indemnity attorneys' fee provision was not limited to third-party claims." Ajax addressed whether a subcontractor, Ajax Paving Industries ("Ajax"), was entitled to attorney's fees under a subcontract's indemnity provision in a third-party action brought against it by the general contractor, The Hardaway Company ("Hardaway"). Ajax, 824 So. 2d at 1027-28. Previously, Hardaway had been separately sued for personal injury damages related to work that Ajax had completed. Id. at 1027. Consequently, it filed the third-party action against Ajax pursuant to the subcontract's indemnity provision, demanding that Ajax defend and indemnify it for any damages awarded in the personal injury action. Id. Ultimately, Hardaway voluntarily dismissed the suit and Ajax was awarded prevailing party attorney's fees based on the contract's indemnity provision. Id. at 1028-29.

Ajax is not dispositive here. First, Ajax addressed whether a party was entitled to attorney's fees under an indemnity provision in a third-party indemnity action for liability on a third-party claim. Id. at 1027-28. Contrary to Fidelity's suggestion then, it does not speak to the threshold issue here—whether an

18

indemnity provision allows for attorney's fees in a contract dispute between the parties to the contract. Second, the main issue in Ajax was whether Ajax was the prevailing party, not whether the indemnity provision was a contractual basis for attorney's fees. As such, the Florida court in Ajax did not expressly consider the question. Id. at 1027-29.

Fidelity's reliance on ADF fares no better because the indemnity clause at issue there contained language indicating that indemnification was not limited to third party liability. In ADF, the district court in the Middle District of Florida concluded that an indemnity clause allowed a subcontractor to recover attorney's fees from the contractor in a dispute regarding the subcontract. ADF, 2001 WL 34402607 at *1-2. In citing to this district court decision, Fidelity fails to acknowledge this Court's opinion on appeal, which explained why the indemnity clause did not only apply to claims involving third party liability. ADF Int'l, Inc. v. Baker Mellon Stuart Constr., Inc., No. 01-12454 (11th Cir. Feb. 13, 2002) (unpublished). Specifically, the second sentence in the indemnification clause there read: "The foregoing obligations of ADF include, but are not limited to, indemnifying, defending and holding harmless from claims made by third parties against any of the Indemnified Parties." Id., slip op. at 7. Because the second sentence clearly said that indemnification was not limited to third party claims, we concluded that it was impossible to construe the provision as being limited to third

19

party claims only.  Id.  In contrast, the indemnification clause here contains no such similar language.  Therefore, ADF does not support Fidelity's argument at all.  Rather, it is consistent with our conclusion that the general indemnity provision in Section 9.5 applies only to claims of third party liability.

## IV. CONCLUSION

The indemnity provision in Section 9.5 of the subcontract is a general indemnity clause that on its face applies only to third party claims, not to suits between Americaribe and CPM.  It does not authorize Americaribe as a contracting party to recover attorney's fees when Americaribe is required to take legal action against CPM to enforce the subcontract.  The Section 9.5 indemnity provision is therefore not a unilateral attorney's fees provision and the reciprocal effect of Fla. Stat. § 57.105 is inapplicable.  As a consequence, we need not reach any issues as to whether surety principles would allow Fidelity to recover attorney's fees in the shoes of CPM here, as CPM has no right to attorney's fees under Section 9.5 in the first place.

The district court erred by concluding otherwise.  Accordingly, the district court abused its discretion in awarding Fidelity attorney's fees.  We therefore reverse the award of attorney's fees to Fidelity against Americaribe and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**