[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11977

_____

RJ'S INTERNATIONAL TRADING, LLC,

Plaintiff-Appellant,

*versus*

CROWN CASTLE SOUTH, LLC,

Defendant-Appellee,

AT&T CORP.,

Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-25162-CMA

_____

Before JORDAN, LAGOA, and MARCUS, Circuit Judges.

LAGOA, Circuit Judge:

This case involves a property and contract dispute between RJ's International Trading, LLC ("RJI"), and Crown Castle South, LLC ("Crown Castle"). The central issue in this case is whether, under Florida law, a prevailing-party attorney's fee provision can be interpreted as a real covenant such that it runs with the land and binds non-signatories. The district court concluded that it cannot, reasoning that an attorney's fee provision does not touch and concern the land. RJI timely appealed that decision to this Court.

The Florida Supreme Court, which is the final arbiter of Florida law, has not published a decision addressing this question, and the Florida intermediate appellate courts, in addressing analogous issues, have reached different conclusions. Given the uncertainty we face, principles of comity and federalism suggest that the Florida Supreme Court, and not this Court, should decide this issue of Florida law. *See Steele v. Comm'r of Soc. Sec.*, 51 F.4th 1059, 1061 (11th Cir. 2022); *WM Mobile Bay Env't Ctr., Inc. v. City of Mobile Solid Waste Auth.*, 972 F.3d 1240, 1242 (11th Cir. 2020). We therefore respectfully certify the issues of Florida law discussed below to the Florida Supreme Court.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

To understand the dispute between RJI and Crown Castle, we must look back a few decades in the property's history. In 1992, BellSouth Mobility, Inc., entered into a land lease agreement with Hidden Valley Corporation. Under their agreement, BellSouth agreed to use the property located at 9690 S.W. 170th Street, Miami, Florida, (the "Property") for the purpose of constructing, maintaining, and operating a communication facility. The lease provided "nonexclusive rights for ingress and egress . . . for the installation and maintenance of utility wires, cables, conduits, and pipes over, under or along a twenty foot wide right of way."

In 1993, Hidden Valley executed, for BellSouth's benefit, a Grant of Non-Exclusive Easement Agreement (the "Easement Agreement") "for utilities and vehicular and pedestrian ingress and egress over, across[,] and upon the Easement Property," and "over, across, and upon the Easement Property for the purpose of . . . [c]onstructing, maintaining, repairing and replacing paved areas for vehicular and pedestrian ingress to and egress from the Benefitted Property[ ] and . . . [c]onstructing, maintaining, and replacing utility facilities." Later that year, RJ International Trading, Inc., bought the Property subject to the Easement Agreement.

The Easement Agreement also includes the following fee provision:

> The parties hereto shall each have the right to enforce the terms of this Easement and the rights and obligations created herein by all remedies provided under

the laws of the State of Florida, including, without limitation, the right to sue for damages for breach or for injunction or for specific performance. In the event that it is necessary for either party hereto to file suit in order to enforce the terms hereof, then the prevailing party in such suit shall be entitled to receive reasonable attorney's fees and court costs in addition to any other award that the court might make, from the non-prevailing party.

In 1999, Crown Castle's predecessor-in-interest, Crown Castle South, Inc., subleased the Property from BellSouth. The Sublease Agreement granted to Crown Castle South, Inc.,

the nonexclusive rights of ingress to and egress from the entire Adjoining Site, and access to the entire Tower and all Improvements (including any and all easements), at such times (on a 24-hour, seven (7) day per week basis), to such extent, and in such means and manner (on foot or by motor vehicle) as the Transferring Entity deems necessary or desirable for its full use and enjoyment of the Reserved Space.

In 2005, RJ International Trading, Inc., conveyed the property to RJI. In 2019, Crown Castle—the Appellant and the successor-in-interest to Crown Castle South, Inc.,—entered into a license agreement with Crown Castle Fiber LLC, under which the latter could "install, operate and maintain the Equipment at the Site within the Licensed Space." This "Equipment" includes cables, wires, fiber, conduit, and other related hardware and software.

To summarize: when the facts that gave rise to this case occurred, RJI owned the property and leased it to BellSouth. BellSouth, in turn, subleased the property to Crown Castle, which then licensed its affiliate, Crown Castle Fiber LLC, to install and operate communications equipment on the property. This dispute, therefore, lies between a subsequent purchaser (RJI) from the original grantor (Hidden Valley) on the one hand, and a sublessee (Crown Castle) of the original grantee (BellSouth) on the other.

In February 2020, Crown Castle excavated a portion of the Property without RJI's notice or consent and installed fiber-optic cables beneath and beyond the Easement. RJI told Crown Castle that the fiber-optic installation exceeded the Easement. Then, in December 2020, RJI sued for declaratory judgment, breach of the Easement Agreement, unjust enrichment, trespass, and injunctive relief.

The district court dismissed the counts for declaratory judgment and injunctive relief, and Crown Castle eventually moved for summary judgment on the three remaining claims against it: breach of the Easement Agreement, unjust enrichment, and trespass. RJI, for its part, filed a cross-motion for partial summary judgment on the issues of liability and equitable relief for its claims for breach of the Easement Agreement and trespass.

For our purposes, we need only recount the district court's treatment of RJI's claim for breach of the Easement Agreement. The district court found that a valid Easement Agreement existed, creating an easement appurtenant that runs with the land and

binds successors-in-interest *and* that could be enforced against a third-party non-signatory. The district court further concluded that the Easement Agreement did not contemplate underground rights, but rather only "a non-exclusive easement over, across and upon" the easement property. Having found Crown Castle liable for a breach, the district court denied Crown Castle's motion for summary judgment as to breach of the Easement Agreement and granted RJI's motion for summary judgment as to liability and equitable relief for breach of the Easement Agreement, reserving the question of non-nominal damages for a jury.[1]

At the conclusion of trial, the jury returned a verdict awarding: $1.00 for the breach of easement claim; $40,000.00 for the trespass claim; $637.74 for the unjust enrichment claim (which RJI opted to forgo in favor of retaining the breach of Easement Agreement remedies); and no punitive damages. The district court entered final judgment in RJI's favor, finding RJI was entitled to an additional $5,606.20 in prejudgment interest. It also declined to enter a permanent injunction in favor of RJI.

We now reach the issues that gave rise to this appeal. After the district court entered final judgment (which Crown Castle did not appeal), RJI moved for attorneys' fees as the prevailing party pursuant to the Easement Agreement's fee provision.

---

[1] The district court later vacated its grant of equitable relief—an injunction requiring Crown Castle to remove the fiber-optic cables—and reserved the issue for trial.

RJI's argument was relatively straightforward: RJI asserted that it was a prevailing party and that the Easement Agreement provides for "reasonable attorney's fees and costs . . . from the non-prevailing party."  RJI contended that "the covenant running with the land clause states the easement agreement and its provisions inured for the benefit of successors in interest" and that "[t]hus, RJI and Crown Castle had a right to enforce the agreement."  This covers, in RJI's view, the fee provision's use of the phrase "the parties hereto."

The district court denied the motion for entitlement to fees, reasoning that the fee provision was a personal covenant (and not a real covenant) because it does not "touch upon and concern the land" under Florida law.  Because only real covenants run with the land, the district court concluded that the fee provision created rights and obligations only as to the original contracting parties—and not as to RJI and Crown Castle.

This timely appeal followed.

## II.    RELEVANT LAW

Before addressing the parties' arguments, we first set forth the legal principles relevant to this appeal.

### A.    Florida's Law Governing Attorneys' Fees

"'Our basic point of reference' when considering the award of attorney's fees is the bedrock principle known as the 'American Rule': Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Hardt v. Reliance Standard*

*Life Ins. Co.*, 560 U.S. 242, 252–53 (2010) (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 683 (1983)). In diversity cases, a party's entitlement to attorneys' fees is determined according to state law. *Cf. All Underwriters v. Weisberg*, 222 F.3d 1309, 1311 (11th Cir. 2000) (noting that a statutory right to fees is a substantive issue for *Erie*[2] purposes). "Florida generally follows the American Rule, under which each side pays its own attorney's fees." *Azalea Trace, Inc. v. Matos*, 249 So. 3d 699, 701 (Fla. 1st Dist. Ct. App. 2018) (citing *Johnson v. Omega Ins. Co.*, 200 So. 3d 1207, 1214 (Fla. 2016)). Accordingly, under Florida law, "attorney's fees may only be awarded by a court pursuant to an entitling statute or an agreement of the parties." *Dade County v. Pena*, 664 So. 2d 959, 960 (Fla. 1995). When a contract or statute provides for prevailing-party fees, "the test is whether the party 'succeeded on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Moritz v. Hoyt Enters., Inc.*, 604 So. 2d 807, 819–10 (Fla. 1992) (alteration adopted) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

Under Florida law, "a contractual attorney's fee provision must be strictly construed." *Int'l Fid. Ins. Co. v. Americaribe-Moriarty JV*, 906 F.3d 1329, 1335 (11th Cir. 2018) (quoting *B&H Constr. & Supply Co. v. Dist. Bd. of Trs. of Tallahassee Cmty. Coll.*, 542 So. 2d 382, 387 (Fla. 1st Dist. Ct. App. 1989)). Therefore, "if an agreement for one party to pay another party's attorney's fees is to be enforced it must unambiguously state that intention and clearly identify the

---

[2] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

matter in which the attorney's fees are recoverable." *Sholkoff v. Boca Raton Cmty. Hosp.*, 693 So. 2d 1114, 1118 (Fla. 4th Dist. Ct. App. 1997). "If it is ambiguous, the court will not struggle by construction of the language employed to infer an intent for fees that has not been clearly expressed; nor will it allow intentions to indemnify another's attorney's fees to be ambiguously stated and then resolved by the finder of fact." *Id.*

Finally, strangers to an agreement (such as third-party beneficiaries) are generally not bound by prevailing-party provisions. *See Civix Sunrise, GC, L.L.C. v. Sunrise Rd. Maint. Ass'n, Inc.*, 997 So. 2d 433, 435 (Fla. 2d Dist. Ct. App. 2008) ("Because the appellees were not signatory parties to the lease, they are not entitled to recover their attorney's fees under paragraph 20."). But the result can be different depending on the language of the agreement. *See MSI Fin. Group, Inc. v. Veterans Const. Corp.*, 645 So. 2d 178, 179 (Fla. 3d Dist. Ct. App. 1994) (where promissory note stated that "all persons" would be liable for costs and attorney's fees, assignee of note was entitled to recover fees).

### B.    Florida's Law on Real and Personal Covenants

Covenants are "promises in conveyances or other instruments pertaining to real estate" and can be either "real" or "personal." *Palm Beach County v. Cove Club Inv. Ltd.*, 734 So. 2d 379, 382 n.4 (Fla. 1999) (quoting 19 Fla. Jur. 2d *Deeds* § 168 (1998)). A real covenant "creates a servitude upon the reality for the benefit of another parcel of land" and "binds the heirs and assigns of the original covenantor." *Id.* (quoting 19 Fla. Jur. 2d *Deeds* § 174). A

personal covenant "creates a personal obligation or right enforceable only between the original covenanting parties." *Id.* (quoting 19 Fla. Jur. 2d *Deeds* § 174).  Florida's Third District Court of Appeal explained the difference as follows:

> A covenant running with the land differs from a merely personal covenant in that the former concerns the property conveyed and the occupation and enjoyment thereof, whereas the latter covenant is collateral or is not immediately concerned with the property granted.  If the performance of the covenant must touch and involve the land or some right or easement annexed and appurtenant thereto, and tends necessarily to enhance the value of the property or renders it more convenient and beneficial to the owner, it is a covenant running with the land.

*Maule Indus., Inc. v. Sheffield Steel Prods., Inc.*, 105 So. 2d 798, 801 (Fla. 3d Dist. Ct. App. 1958); *see Hayslip v. U.S. Home Corp.*, 336 So. 3d 207, 209 (Fla. 2022) ("Covenants are divisible into two major classes: (1) real covenants which run with the land and typically bind the heirs and assigns of the covenanting parties, and (2) personal covenants which bind only the covenanting parties personally.").  "The primary test whether the covenant runs with the land or is merely personal is whether it concerns the thing granted and the occupation or enjoyment thereof," or, on the other hand, whether it is merely "a collateral or a personal covenant not immediately concerning the thing granted." *Hagan v. Sabal Palms, Inc.*, 186 So. 2d 302, 310 (Fla. 2d Dist. Ct. App. 1966).  More recently, the Fourth District Court of Appeal articulated a three-part test for

determining whether a covenant runs with the land—*i.e.*, to establish whether a covenant is a real covenant: "a plaintiff must show (1) the existence of a covenant that touches and involves the land, (2) an intention that the covenant run with the land, and (3) notice of the restriction on the part of the party against whom enforcement is sought." *Winn-Dixie Stores, Inc. v. Dolgencorp, Inc.*, 964 So. 2d 261, 265 (Fla. 4th Dist. Ct. App. 2007).

### III.     ANALYSIS

With these general legal principles in mind, we now address the issue before us.  On appeal, RJI argues that the district court erred in denying its motion for attorneys' fees for two reasons: (1) when viewing the Easement Agreement as a whole, the plain language of the Agreement establishes that Crown Castle is bound by the attorneys' fees provision; and (2) the remedies provision touches and concerns the land and, therefore, binds successors as a covenant that runs with the land.  In response, Crown Castle maintains that "[t]he district court's decision properly focused on the narrow issue of whether the Fee Provision runs with the land to subject a third party, which has limited access to the land, to this provision."  Therefore, Crown Castle asserts, "[n]otwithstanding any relationship to the easement, RJI and Crown Castle are not parties to the Easement Agreement and the Fee Provision, and they have no contract for fees between them."

RJI's first argument—that the plain language of the agreement binds Crown Castle to pay prevailing party attorneys' fees—hinges on our interpretation of "the parties hereto" as something

12                    Opinion of the Court                    22-11977

broader than just "the signatories to the agreement."[3]  As we have explained, RJI is the subsequent purchaser from the original grantor (Hidden Valley) and Crown Castle is a sublessee of the original grantee (BellSouth).  And the fee provision provides that "[t]he *parties hereto* shall each have the right to enforce the terms of this Easement and the rights and obligations created herein . . . . [and i]n the event that it is necessary for *either party hereto* to file suit in order to enforce the terms hereof, then the prevailing party in such suit shall be entitled to receive reasonable attorney's fees and court costs in addition to any other award that the court might make, from the non-prevailing party."  The salient question, then, is whether a subsequent purchaser from the grantor is a "party" who can enforce this fee provision against a sublessee of the grantee.

RJI urges us to read "the parties hereto" broadly, based on the bedrock principle that we read contracts in their entirety to "arrive at a reasonable interpretation of the text of the entire agreement to accomplish its stated meaning and purpose." *Delissio v. Delissio*, 821 So. 2d 350, 353 (Fla. 1st Dist. Ct. App. 2002).  In particular, RJI points to two other portions of the Easement Agreement

_____

[3] We note that the district court did not find that RJI and Crown Castle are either "parties" to the agreement or "successors" to the original signatories, and instead considered them "successors-in-interest" with respect to the real covenant.  And notably, in its order denying the fee motion, the district court admonished RJI for having "mischaracterize[d] the Summary Judgment Order" by suggesting that the order "conclude[ed] that Crown Castle and RJI were parties to the agreement."  We now address a more nuanced question, though, as to whether successors-in-interest are properly within the scope of "the parties hereto" for purposes of enforcing the fee provision.

that ought to inform our reading of the fee provision: first, its prefatory language, which states that the Easement Agreement was executed by Hidden Valley in favor of "BellSouth Mobility Inc, its successors and assigns." Second, RJI highlights the "Covenant Running with the Land" paragraph, which states that all conditions of the Easement Agreement shall run with the land, "binding upon and inuring to the benefit of the Grantor or Grantee . . . and their respective heirs, successors and assigns, including, without limitation, all subsequent owners of the Easement Property[.]" In RJI's view, assuming that it is a successor to Hidden Valley and Crown Castle is a successor to BellSouth, a holistic reading should mean that they are both enveloped within the meaning of "the parties hereto" for the purposes of enforcing the fee provision.

We find no cases directly on point under Florida law (nor have the parties alerted us to any[4]), but there are some that provide

---

[4] We find little help in the arbitration-clause cases that appear in the briefing. "In general, courts favor arbitration provisions and will try to resolve an ambiguity in an arbitration provision in favor of arbitration." *Vanacore Constr., Inc. v. Osborn*, 260 So. 3d 527, 530 (Fla. 5th Dist. Ct. App. 2018); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) ("The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."). But a contractual attorney's fee provision, on the other hand, "must be strictly construed." *Int'l Fid. Ins. Co.*, 906 F.3d at 1335; *see also Sholkoff*, 693 So. 2d at 1118 ("[I]f an agreement for one party to pay another party's attorney's fees is to be enforced it must unambiguously state that intention and clearly identify the

partial guidance. In *Civix*, Florida's Second District Court of Appeal reversed the trial court's grant of attorney's fees to a prevailing party on similar, but not precisely analogous, facts. 997 So. 2d at 434. There, Civix had purchased property that was the subject of a 99-year lease. *Id.* Among the various terms of the lease, the lessee was required to operate a golf course on the property and sell a set number of memberships to any affiliated golf club or country club to residents of the adjacent developments, which were run by homeowner and condominium associations. *Id.* Some time after Civix bought the property, it stopped operating the golf course and revealed a plan to develop the property in some other fashion. *Id.* The associations then sued Civix to prevent it from executing that development plan. *Id.* The associations prevailed in relevant part, winning a declaration that the lease's covenants continued to encumber the property and that they were intended beneficiaries of certain paragraphs of the lease agreement, including the provisions that required Civix to operate a golf course and sell memberships to the associations' residents. *Id.* The associations then sought their attorney's fees pursuant to a paragraph in the lease that stated that "[a]ny party failing to comply with the terms of this lease agreement shall pay all expenses, including a reasonable attorneys' fee, incurred by the other party hereto as a result of such failure." *Id.* Civix opposed the motion, arguing that the fee provision only

---

matter in which the attorney's fees are recoverable."). We think it unwise, thus, to take guidance from arbitration-provision cases in our parsing of an attorney's fee clause.

inured to the benefit of "parties" to the lease. *Id.* The trial court rejected Civix's view and awarded the associations their fees, reasoning that the associations, as intended third-party beneficiaries, were able to avail themselves of the fee provision. *Id.* On appeal, the Second District Court of Appeal reversed, holding that while the associations had "established that they were the intended beneficiaries of the lessee's promise to operate a golf course, nothing in the lease indicates the parties intended for them to benefit from, or for that matter be subject to, the attorney's fee provision." *Id.* at 435.

In *Harris v. Richard N. Groves Realty, Inc.*, 315 So. 2d 528 (Fla. 4th Dist. Ct. App 1975), the Fourth District Court of Appeal considered a similar fee dispute between the would-be buyers, seller, and broker of a failed real estate deal. In that case, the Harrises entered a contract to buy real property from Kirkwood Investment, contingent upon two subsequent conditions being satisfied. *Harris*, 315 So. 2d at 528. The Harrises paid an $8,750 deposit to Richard N. Groves Realty, the broker to the transaction. *Id.* But the Harrises were not able to satisfy either of the two conditions upon which the contingent contract depended, so the sale fell apart. *Id.* The Harrises demanded that Groves return their deposit, which Kirkwood maintained it was entitled to keep because the Harrises defaulted on the contract, and litigation ensued. *Id.* at 529. After a hearing on Groves's petition for declaratory judgment, the trial court entered final judgment awarding the $8,750 deposit to Groves and Kirkwood. *Id.* Groves then moved for attorney's fees, based on the following provision in the purchase contract between

16                    Opinion of the Court                    22-11977

Kirkwood and the Harrises: "In connection with any litigation arising out of the contract, the prevailing party shall be entitled to recover all costs incurred, including reasonable attorney's fees." *Id.* The trial court, based on that clause, ordered the Harrises to pay Groves' fees. *Id.* On appeal, however, the Fourth District Court of Appeal reversed, reasoning that—notwithstanding the broad reference to "any litigation arising out of the contract"—the term "prevailing party" was properly read to be limited to the parties to the contract, *i.e.* the Harrises and Kirkwood, and could not extend to include non-party Groves. *Id.*

These cases, and others in the same line, create a rule counseling that attorney's fee provisions are not likely to be enforceable by or against a third party. We recognize, however, that there is an additional wrinkle in our case—neither RJI nor Crown Castle is truly a stranger to the contract, because they each stand in some sort of privity of estate with the original contracting parties. To that point, while we again find no case directly on point under Florida law, we have identified some guideposts.

In *Westinghouse Electric Corporation v. Metropolitan Dade County*, 592 So. 2d 1134 (Fla. 3d Dist. Ct. App. 1991), the appellate court held that a successor-in-interest to a contract was required to fulfill a contractual duty to defend where that duty was undertaken by the predecessor-in-interest. *Westinghouse*, 592 So. 2d at 1135. In other words, even though the successor was not a signatory, it was bound to the predecessor's commitment and the counterparty was entitled to enforce that commitment. We note, though, that in

*Westinghouse*, the parties stipulated that Schindler, the successor, was a "successor in interest to the contract, and as such, was bound by the terms of the contract from that point forward." *Id.* We, of course, have no such concession here. Cutting the other way, in *Dawdy v. Leonard*, 145 Fla. 562, 567 (Fla. 1940), Florida's highest court determined that while a sublease "operated to create a privity of *estate* between the landlord and [the sublessee], it did not create a privity of *contract* between the landlord and [the sublessee]." (emphases added). *Dawdy* would suggest to us that—although Crown Castle is bound to certain portions of the Easement Agreement—it may not, as a non-signatory, be bound to the whole of the contract. *Westinghouse*, in contrast, contemplates that a successor-in-interest may, at least in some circumstances, be bound to a contract it did not sign.

So where does all this leave us? As a general rule, we strictly construe contractual fee provisions and, where the contract is not unambiguously clear, we "will not struggle by construction of the language employed to infer an intent for fees that has not been clearly expressed." *Sholkoff*, 693 So. 2d at 1118; *see also Int'l Fid. Ins. Co.*, 906 F.3d at 1335. We find ourselves now, on the record before us and the parties' submissions, and based on the law as it exists, struggling to infer an intent for fees—to RJI, and from Crown Castle—from a contract that neither of those parties drafted or signed. We, therefore, decline to reverse the district court on this basis. *Cf. Huck v. Kenmare Commons Homes Assoc., Inc.*, --- So. 3d --- , 2023 WL 4613062, at *3 (Fla. 1st Dist. Ct. App. July 19, 2023) ("Because the Hucks did not make the parking promise—there is no binding

contract here, supported by consideration—it could bind them only if it could be said to 'run with their land.'").

The second question before us is whether the prevailing-party fee provision in the Easement Agreement is enforceable by and against RJI and Crown Castle as a real covenant running with the land. This is a matter of first impression for this Court; what's more, it also appears to be a matter of first impression for Florida's appellate courts.

Finding nothing precisely on point in our review of Florida case law, we (and the district court below) have identified three cases addressing similar issues: *Caulk v. Orange County*, 661 So. 2d 932 (Fla. 5th Dist. Ct. App. 1995), *J.H. Williams Oil Co. v. Harvey*, 872 So. 2d 287 (Fla. 2d Dist. Ct. App. 2004), and *Hayslip v. U.S. Home Corp.*, 336 So. 3d 207 (Fla. 2022). But in our view, we cannot reliably predict how the Florida courts would rule in this case based on those three precedents.

First, in *Caulk*, Caulk (the original grantor) conveyed real property to Hibbard (the original grantee) by a deed that reserved a right for Caulk to take "any and all proceeds arising out of . . . condemnation . . . by any government authority." 661 So. 2d at 933. Hibbard sold the land to Hibbard Oil Co., which then sold the land to Amoco Oil Company. *Id*. Neither of those two subsequent deeds included the language reserving condemnation proceeds to Caulk. *Id*. Fifteen years after Caulk conveyed the land to Hibbard, the land was condemned, and Caulk claimed interest in the proceeds based on her original deed. *Id*. The trial court allowed her

to intervene but ultimately denied her request for apportionment of proceeds, finding that the deed covenant was personal and not real. *Id.* On appeal, the Fifth District Court of Appeal agreed that "[t]he covenant in Caulk's deed to Hibbard is incapable of running with the land," explaining that:

> Although the covenant "concerns" the land, it does so only tangentially. Unlike covenants respecting mineral rights and crops, for example, which directly impact the use of the land, the covenant in the instant case has no effect whatever on the land. The only thing the covenant in the instant case really "touches" and "concerns" is the intangible personal property, namely cash, that may be paid by a condemnor.

*Id.* at 934. *Caulk* appears to articulate a rule that covenants *tangentially* concerning the land, and really concerning cash to be paid, are personal covenants that do not run with the land.

In *Harvey*, however, the Second District Court of Appeal called into question whether the Fifth District Court of Appeal pronounced such a rule in *Caulk*. There, a trust held by several members of the Harvey family (the "Trust") sold land to Chevron Oil Company pursuant to a reservation agreement, which provided that if certain portions of the land were ever taken by eminent domain, the Trust would receive the eminent domain proceeds. *Harvey*, 872 So. 2d at 288. The agreement was recorded in the public record and specifically bound Chevron's and the Trust's successors and assigns. *Id.* Chevron then conveyed the land to Williams, "[s]ubject to . . . [a]ll easements, reservations, exceptions and

restrictions of record," including, specifically, the eminent domain agreement with the Trust. *Id.* (some alterations in original). Later, the Florida Department of Transportation took the parcel by eminent domain and named both Williams and the Trust in the suit, and the Trust filed a cross-claim against Williams to enforce the reservation agreement. *Id.* at 288–89. The trial court ruled in the Trust's favor at summary judgment. *Id.* at 289.

On appeal, the Second District Court of Appeal agreed that Williams was estopped by deed from claiming entitlement to the condemnation proceeds. *Id.* "The language of the reservation agreement," the court reasoned, "expressed the intention of the Trust and Chevron that the title to the property be taken subject to this reservation." *Id.* In reaching this conclusion, the court distinguished *Caulk*, which Williams had offered as support for his claim. *Id.* For two reasons, the *Harvey* court found *Caulk* unpersuasive. First, Caulk's reservation was only found in the original deed by which Caulk conveyed the property to Hibbard, and that language was not included in the deeds for the subsequent conveyances. *See id.* Second, the court noted that *Caulk*'s holding was based on "the language of that particular deed, not upon whether such an interest qualifies as one that could run with the land." *Id.* Therefore, the *Harvey* court found that *Caulk*'s observation that the reservation of proceeds did not sufficiently concern the land was "dicta." *Id.* The court concluded that "the language in the deeds and the reservation agreement at issue [in *Harvey*] clearly indicates that the parties intended to bind all successors and assigns and that the subsequent conveyance was subject to this reservation." *Id.*

Finally, we turn to the Florida Supreme Court's recent decision in *Hayslip*. There, U.S. Home built and sold a home to an original purchaser, with transfer of title conveyed via special warranty deed that included an arbitration provision and a waiver of judicial remedy. *Hayslip*, 336 So. 3d at 208. The covenants and conditions of that deed provided that the deed bound both the original purchasers and subsequent purchasers and specifically referenced the arbitration provision as an "equitable servitude[], perpetual and run[ning] with the land." *Id*. at 209. The deed also expressly stated that the grantee agreed to bind its heirs, successors, and assigns to the deed's terms. *Id*. The original purchasers sold the home to the Hayslips by a deed that provided the conveyance was "subject to easements, restrictions, reservations and limitations." *Id*. (alteration adopted). Seven years later, the Hayslips sued U.S. Home, alleging the builder had improperly installed stucco in violation of a Florida Building Code provision. *Id*. U.S. Home moved to compel arbitration, which the court granted. *Id*.

On appeal, the Second District Court held that the arbitration clause was valid and binding and that it was a covenant running with the land. *Id*. The district court certified a question to the Florida Supreme Court, which the Florida Supreme Court rephrased as follows: "[d]oes a deed covenant requiring the arbitration of any dispute arising from a construction defect run with the land, such that it is binding upon a subsequent purchaser of the real estate who was not a party to the deed?" *Id*. at 208.

The Florida Supreme Court accepted review and concluded that such an arbitration provision runs with the land because it "touches and concerns the property itself [and] 'affects the mode of enjoyment of the premises.'" *Id*. at 210 (quoting *Winn-Dixie Stores*, 964 So. 2d at 264 (internal quotation omitted)). The court explained that "the thing required to be done" in the case before it—fixing a defect in the home's construction—could only be remedied through those arbitration proceedings. *Id*. (quoting *Hagan*, 186 So. 2d at 310). Said differently, the court found that the arbitration clause "touches the enjoyment of the land because the Hayslips benefit from the defective stucco being resolved." *Id*.

RJI urges us to follow *Harvey* and *Hayslip*, insisting that the attorneys' fee provision—like *Hayslip*'s arbitration provision—is part and parcel of seeking full enjoyment of the land, and that it flows to all successors—like the Trust's reservation in *Harvey*. Crown Castle, on the other hand, contends that the district court correctly followed *Caulk* to the necessary conclusion that the fee provision is not a real covenant because it concerns the land "only tangentially" and "has no effect whatever on the land." *Caulk*, 661 So. 2d at 934. In our case, after all, as in *Caulk*, "the only thing the covenant . . . really 'touches' and 'concerns' is the intangible personal property, namely cash, that may be paid." *Id*.

We find that both interpretations are reasonable under extant Florida law. On one hand, in *Caulk*, the Fifth District Court of Appeal appeared to hold that a covenant for payment of cash is merely tangential to the land and, thus, does not touch and concern

the land so as to run with it (and bind heirs, assigns, or successors). And this seems consistent with a historical understanding of real covenants as those that "create[] a servitude upon the reality for the benefit of another parcel of land," and personal covenants as those which "create[] a personal obligation or right enforceable at law only between the original covenanting parties." *Cove Club*, 734 So. 2d at 382 n.4. The payment of cash, whether as condemnation proceeds or prevailing-party attorneys' fees, cannot truly be said to create a servitude upon the reality for the benefit of an adjoining parcel.

On the other hand, though, in *Harvey*, the Second District Court of Appeal found enforceable a substantially similar covenant for the transfer of cash proceeds, where the language of the instrument "expressed the intention of the Trust and Chevron that the title to the property be taken subject to this reservation." 872 So. 2d at 289.

But *Harvey* and *Caulk*, while having some instructive value, are a bit far afield factually from this case. *Hayslip* comes closer to our precise question, holding that an arbitration provision runs with the land when it "affects the mode of enjoyment of the premises." 336 So. 2d at 210. Still, though, we hesitate to assume *Hayslip* would control here because, as we see it, the fee provision at issue here is a step further removed from the land than the arbitration provision was in *Hayslip*. In *Hayslip*, arbitration was the means of resolving alleged defects in the property. Hayslip had to arbitrate with the developer to force the developer to fix defective stucco—

part of the property.  The arbitration was thus one step removed from the property itself.

By contrast, the fee provision here is two steps removed. The parties have already litigated their dispute over Crown Castle's trespass and breach of the easement.  And through that litigation, RJI has already been awarded both equitable and legal remedies. Attorneys' fees to the prevailing party are, therefore, a second step removed from the land—money to make RJI whole for having had to enforce the easement, which has already been accomplished. *Cf. Huck*, 2023 WL 4613062, at *2 ("Running with the land, in essence, is a substitute for consideration.  It turns a promise that would be binding only on the maker into a contract-like obligation that is binding on the maker's successors, even though they personally never signed onto the promise.  Indeed, if the promise can be said to run with the land, purchase of the land with notice is enough.").

Because of the uncertainty we face in resolving this issue, it is not for us to guess how the Florida courts might interpret this area of Florida law.  Rather, given two reasonable and competing interpretations of the Florida law at issue, and the lack of clear consensus among Florida's appellate courts, we believe the proper course is to certify this dispositive issue to the Florida Supreme Court. *See WM Mobile Bay*, 972 F.3d at 1251; *In re Mooney*, 812 F.3d 1276, 1283 (11th Cir. 2016).  "As a matter of federalism and comity, it is often appropriate to certify dispositive issues of Florida law to Florida's highest court for decision." *Steele*, 51 F.4th at 1065; *accord Blue Cross & Blue Shield of Ala., Inc. v. Nielsen*, 116 F.3d 1406, 1413

(11th Cir. 1997).  Indeed, "[c]ertification of state law issues to state supreme courts is a valuable tool for promoting the interests of co-operative federalism."  *Nielsen*, 116 F.3d at 1413.

We therefore certify to the Florida Supreme Court the following question under Florida Rule of Appellate Procedure 9.150:

1) Under Florida law, when an easement agreement contains a prevailing-party attorney's fee provision, is the fee provision a real covenant such that it runs with the land?

Our phrasing of this question "is intended only as a guide." *United States v. Clarke*, 780 F.3d 1131, 1133 (11th Cir. 2015).  It is not our intention to restrict the Florida Supreme Court's consideration of the issues or its scope of inquiry.  *See WM Mobile Bay*, 972 F.3d at 1251.  The Florida Supreme Court "may, as it perceives them, re-state the issues and modify the manner in which the answers are given."  *Id.*  And "[i]f we have overlooked or mischaracterized any state law issues or inartfully stated any of the questions we have posed, we hope the [Florida] Supreme Court will feel free to make the necessary corrections."  *Id.* (quoting *Spain v. Brown & William-son Tobacco Corp.*, 230 F.3d 1300, 1312 (11th Cir. 2000)).

## IV.    CONCLUSION

For these reasons, we defer our decision in this case until the Florida Supreme Court has had the opportunity to consider and determine whether to exercise its discretion in answering our cer-tified question.  The entire record of this case, including the parties' briefs, is transmitted to the Florida Supreme Court.

**QUESTION CERTIFIED.**